[Civ. No. 17613.   First Dist., Div. One.   May 1, 1958.]

ARDMORE HORACE, Appellant, v. HELEN B.
WEYRAUCH et al., Respondents.

Molly H. Minudri for Appellant.

Lamb & Hoge for Respondents.

PETERS, P. J.—Following a subcutaneous injection by Dr. Weyrauch plaintiff developed an ulcer at the site of the injection. This required surgery to remove. She brought this action against the doctor, a specialist in radiology, alleging that the negligence of the doctor caused the ulcer. At the close of the evidence the trial court granted defendant's motion for a directed verdict. Judgment was entered accordingly, and from that judgment plaintiff appeals.

On May 7, 1953, the plaintiff was referred by her regular physician to defendant for a pyelogram, which is an X-ray study of the urinary tract. It is made by the injection of an opaque iodine dye that stops the X-rays so that the inside of kidneys, ureter and bladder can be photographed.

Plaintiff testified that before making the injection the doctor did not ask whether she had any reactions to injections, nor did the doctor ask if plaintiff was sensitive to any particular substance, nor did the doctor make any reaction tests. The doctor first attempted to make the injection into the veins of the patient's right arm, and, when this was not successful, tried to inject the fluid into another part of the arm and then into the wrist. No attempt was made to inject the fluid into the hand. Plaintiff told the doctor that other doctors had had difficulty giving her intravenous injections. After these unsuccessful attempts, the defendant told plaintiff that she could have the injection in the shoulder or in the hip. Plaintiff chose the hip, after first asking the doctor if the doctor had ever given others hip injections, and, if so, whether anything had happened. The doctor answered, "Nothing." Then, according to plaintiff's testimony, the doctor stated that she was first going to inject novocaine to deaden the pain. The doctor first injected the novocaine and then made a second injection into the left hip. Severe pain started with the second injection. Defendant applied hot towels to the area, which eased the pain to some extent. Plaintiff visited defendant professionally for about two months for treatment of the swollen area. Defendant drained the area, put a bandage on it, treated it with X-ray, and furnished some salve. The condition worsened, the flesh fell in, and the area continued to drain. When plaintiff asked defendant about the charges for the treatment the doctor told her there would be no charges

"because she did it," and suggested that plaintiff go to another doctor for a possible operation. She did go first to the Stanford Clinic for treatment for several weeks and, when this was unsuccessful, was operated on at the Stanford Hospital. The hospital records state that the condition was there diagnosed as an "Ulcer secondary to injection of dye for pylography." The surgical report shows that an incision was made about 6 inches in one direction and three inches in the other, and deeply into the left hip to excise the ulcer. The wound was then drawn together and has healed satisfactorily. Plaintiff was required to stay in the hospital for 15 or 16 days.

The defendant's testimony differs from that of plaintiff in several respects. The doctor testified that she did ask the plaintiff if she was allergic, whether she had ever had hay fever or asthma, and whether she knew if she was sensitive to any drugs. Then on the right arm of the patient she or her assistant made an intradermal test to ascertain whether the patient was allergic to the solution she intended to use, and the test was negative. Then she prepared to make the injection. The solution used was Neo-iopax, an iodine solution excreted by the kidneys. She tried to make an intravenous injection first into the right arm of the patient, then in the left, then into one of the wrists and finally into the veins of one of the hands of the patient. Some of the fluid went into the veins, but the area around the injections started to bleed because the patient had friable veins. The defendant decided that it was not desirable to use such veins because occasionally a thrombosis results. During these unsuccessful attempts the defendant used 10 c.c. of the solution, but not all of this went into the veins because some of it was on the table or in the needles. She observed no adverse reactions of the plaintiff to these unsuccessful attempts, and the plaintiff made no complaints. Defendant then suggested that a leg vein be tried, or that the injection be made in the buttocks. The patient preferred the buttocks. The doctor admitted that she did not tell the patient that there might be a reaction because she did not expect one. She denied that the plaintiff asked about the possibility of a bad reaction, stating that the patient simply asked her if it would hurt and that she replied that it would. The defendant did not tell the plaintiff that Neo-iopax was an irritant although, in sufficient concentration, it is an irritant to everyone. The doctor stated that she had injected Neo-iopax intravenously several thousand times, sub-

cutaneously two or three dozen times, and intramuscularly on occasion. Between 1940 and 1956, on two or three dozen occasions, the injection had been made in the buttocks. She had heard that sometimes such injections cause a reaction but had never observed one. It is not customary to explain to patients that there might be adverse reactions. The doctor also testified that she tested the patient for a reaction before making the injection, first in the arm and then on the buttock, but there was no reaction. The doctor did not think that such tests for sensitivity were very satisfactory. The only reason that she gave such tests "is for medico-legal reasons. It's the custom to give tests and we do it."

After the tests the injection was made subcutaneously about a quarter of an inch below the surface. About 30 c.c. or about two tablespoons of a 50 per cent solution were injected. The patient immediately complained of pain, and hot packs were put on the area. About a week later the patient came back. The area at the site of the injection was red, swollen and tender. No pus was found. Defendant diagnosed the condition as an iodine granuloma caused by a sensitive reaction to iodine. She treated the condition several times but it did not clear up. She told the patient that it would slowly heal but if the cure were to be hastened an operation was necessary. The patient decided on the operation.

A bottle of Neo-iopax and its box container were introduced into evidence. On the box in heavy letters appears "For Intravenous Urography," and in the enclosed directions the manufacturer states "for intravenous and retrograde urography." The manufacturer does not state anything about subcutaneous or intramuscular injections. The defendant testified, however, that it is common standard practice in this community to give Neo-iopax subcutaneously or intramuscularly if it cannot be given intravenously. She also testified that this was her first patient to develop a granuloma from such an injection, but she had heard of two such cases in San Francisco in the past six years. She said that a granuloma was caused by sensitivity of the patient.

A doctor Culiner, a specialist in chest and general surgery called by defendant, testified that he had examined plaintiff in June of 1953 and advised surgery. He testified that when Neo-iopax is injected subcutaneously "every now and then" a granuloma may result; that it "is a matter of low incidence, but nevertheless a possibility every time it's given." This doctor also testified that Neo-iopax is usually given intra-

venously, but where that is not possible, then intramuscularly or subcutaneously, and that there are many people with whom an intravenous injection is not possible.

Doctor Rodenbaugh, a specialist in radiology, was also called by defendant. He also testified that when the injection cannot be given in the veins it is good practice to give it subcutaneously. Granulomas caused by such injections are not rare. They are caused by sensitivity of the individual rather than to pressure or overinjection. About 10 to 12 per cent of the patients have reactions to an intravenous injection. In 1955 some 8½ million injections were given of dye substances for kidney difficulties, and there were 27 recorded fatalities—a risk inherent in taking such injections. Sensitivity tests are not very valuable.

This is a fair summary of the evidence. On this evidence the trial court took the case from the jury by directing a verdict for defendant.

Appellant's main contention is that it was error to direct a verdict because under the facts the doctrine of res ipsa loquitur was applicable. It is very doubtful that the doctrine of res ipsa loquitur is applicable to the facts here involved. The conditions necessary for the application of the doctrine have frequently been stated by the courts. (*Salgo v. Leland Stanford etc. Board of Trustees,* 154 Cal.App.2d 560 [317 P.2d 170] ; *Bauer v. Otis,* 133 Cal.App.2d 439 [284 P.2d 133], and cases cited.)

Whether the doctrine is applicable depends upon whether a layman can say, as a matter of common knowledge or observation, or from the evidence could draw a reasonable inference, that the consequences of the injection here involved were not such as ordinarily would have followed if due care had been exercised. (See *Farber v. Olkon,* 40 Cal.2d 503 [254 P.2d 520] ; *Dees v. Pace,* 118 Cal.App.2d 284 [257 P.2d 756].)

In the instant case the injury arose at the site of the injection. The testimony of the various doctors was all to the effect that it is good and standard practice in this community to give such injections subcutaneously if it cannot be given in the veins. Respondent testified as to why it was not possible or feasible to give this injection into appellant's veins. Thus, there is no basis at all for appellant's assertion that there was an inference of negligence because the injection was here given subcutaneously.

All the testimony is to the effect that the reaction here involved is one of the risks of such an injection. Such toxic effects are caused by the sensitivity of the individual to the dye solution. Thus, there would seem to be no basis for the doctrine of res ipsa loquitur.

■ But there exists another reason why it was error to direct a verdict for respondent. Such a verdict should not be directed if there is any substantial evidence or any reasonable inference from the evidence to support a verdict for the plaintiff. In the instant case we think there is substantial evidence independent of the doctrine of res ipsa loquitur that would support a verdict for appellant. The respondent testified that she asked the appellant about her reactions to injections and made tests for sensitivity. Although respondent and Dr. Rodenbaugh were skeptical about the value of such tests, the fact remains that respondent claimed that she made such tests and asked the relevant questions. The jury could believe from this testimony that the respondent believed that such tests were reasonably necessary, and could disregard her testimony and that of Dr. Rodenbaugh that such tests were of little value. It is certainly a possible and reasonable inference from respondent's testimony that the giving of such tests and the asking of such questions were common and standard procedure in this area. In fact, respondent testified that it was the ''custom to give tests.'' But appellant testified that no such tests were given and no such questions asked. Thus, there is a direct conflict in the evidence on the vital issue of negligence. It is a reasonable inference from the evidence, and the jury could have found, that ordinary care requires the giving of such tests and the asking of such questions. The jury could find that it is negligence not to give such tests or to fail to ask such questions. The jury could have found that no such tests were given and no such questions asked. Thus, there was a factual issue that should have been submitted to the jury. It was error to direct a verdict.

The judgment appealed from is reversed.

Bray, J., and Wood (Fred B.), J., concurred.