[Civ. No. 27318.    Second Dist., Div. Three.    Dec. 24, 1964.]

SAM BRUCE TANGORA, a Minor, etc., et al., Plaintiffs and
Appellants, v. SEYMOUR R. MATANKY, M. D., De-
fendant and Respondent.

Harney, Drummond & Fitzwater, David M. Harney and Robert E. Ford for Plaintiffs and Appellants.

De Forrest Home for Defendant and Respondent.

RICHARDS, J. pro tem.*—This is an appeal by plaintiffs from a judgment entered on a jury verdict for defendant in an action by the surviving husband and minor son of Pauline Tangora for medical malpractice which, it is claimed, resulted in her death. A motion for new trial was made, insufficiency of the evidence being one of the grounds urged, and denied.

Plaintiffs appeal on the following grounds: (1) Insufficiency of the evidence to support the verdict, (2) error in form and manner of submission of interrogatories, (3) error in instruction given and refused, and (4) error in admission of evidence.

### SUFFICIENCY OF THE EVIDENCE.

A. THE FACTS.

Appellants, with commendable frankness, cite and quote

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

*Estate of Bristol,* 23 Cal.2d 221, at 223 [143 P.2d 689] that " 'It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury.' " Substantial evidence is "that which has probative force on the issues and is of ponderable legal significance." (*Walton* v. *Bank of California,* 218 Cal.App.2d 527, 540 [32 Cal.Rptr. 856].)

Appellants contend that here the evidence is insufficient as a matter of law to support a judgment in favor of defendant. When such a contention is made "The appellate court starts with the presumption that the evidence sustains each finding of fact [citations], and the burden rests upon appellant 'to demonstrate that there is no substantial evidence to support the challenged findings.' [Citations.]" (*Davis* v. *Lucas,* 180 Cal.App.2d 407, 409 [4 Cal.Rptr. 479].) Appellants' review of the evidence lacks the objectivity with which we must view it and to a considerable degree deals with conflicts in the evidence. As Witkin puts it (3 Witkin, Cal. Procedure, p. 2250) : "The test . . . is not whether there is substantial conflict, but rather whether there is *substantial evidence in favor of* respondent."

The following is a résumé of the evidence viewed in the light most favorable to the defendant. The deceased, Pauline D. Tangora, was 32 years of age at the time of her death. She had been in good general health all of her life except for some female condition not related to any of the issues here. She was first seen by defendant on January 23, 1960, for injuries received in an automobile accident. He diagnosed contusions, lumbo-sacral strain, whiplash and cerebral concussion and gave her physiotherapy and prescribed medicines for pain, muscle relaxation and sleeping. On January 25th, 26th and 27th she was given physiotherapy and cervical traction. She was seen on January 28, 1960, and defendant noted slight improvement but generalized discomfort and abdominal cramping. That night she sneezed and coughed at home. The following morning she complained to her husband that she was coming down with a cold. The morning of January 29, 1960, she went to defendant's office arriving about 10 a. m. Defendant saw her in the treatment room and inquired how she was feeling at which time she complained of more severe cramping abdominal pain, of generalized discomfort and that

her menstrual period had started. Defendant examined her and found her temperature elevated, tender lymph nodes and that she had a reddened and injected pharynx and congestion in her bronchial tubes indicated by sonorous or noisy rales heard in the stethoscope. She also told defendant that on the evening previous she had begun to feel a generalized aching, sore throat, started coughing, and feeling feverish and that these symptoms had become more intense that morning. On the basis of her statement and his examination, defendant made a diagnosis of "flu syndrome" and decided to give her penicillin, not to combat the influenza virus but to combat secondary infection, specifically strep and pneumococcus which are very common in the throat and to prevent any development from occurring from the infection with the secondary bacterial invaders, such as septicemia. The symptomatology was not just a common cold, but also an infection. Defendant then asked her whether she was allergic in general; whether she was allergic to penicillin to which she stated she had had penicillin several times without any signs of allergy; asked her if she ever had asthma, hay fever or hives to all of which she answered in the negative. Respondent then injected penicillin intramuscularly, either in the arm or buttock. He instructed her to go home, have complete bed rest, take aspirin and fluids and return in three days. Within 10 minutes after the injection, deceased complained of feeling very ill and retched without vomiting. While being taken by defendant to a treatment room she started to have a convulsion and collapsed, which defendant immediately diagnosed as anaphylactic shock, defined as an unusual or exaggerated reaction of the organism to foreign protein or other substances. She was carried into the treatment room, placed on a table and within approximately one minute defendant gave her an intramuscular injection of adrenalin. At this time she still had a pulse and was breathing. Immediately thereafter she was given an injection of Benadryl intramuscularly and 100 per cent oxygen was started by mask after an oral pharyngeal airway had been placed in her mouth and down the throat to the larynx to hold the tongue forward and allow air to pass back and forth. She was also receiving artificial respiration but her heart stopped between 10 and 15 minutes after she started having the anaphylactic shock. Within 30 seconds after her heart stopped, Dr. Adler, who was assisting defendant, performed a thoracotomy or chest incision and massaged the heart while defendant continued the artificial

respiration. This was continued for 20 to 30 minutes but with the exception of a few feeble contractions of the heart muscle, there was no response and at 11 :15 she was pronounced dead.

## B. RES IPSA LOQUITUR

At plaintiffs' request the jury was instructed on res ipsa loquitur by the giving of BAJI Instruction No. 206 (Revised), preceded by BAJI Instruction No. 214-W, as modified, to the effect that the jury must first find that the injury was of a kind which ordinarily does not occur in the absence of negligence before applying BAJI Instruction No. 206.

■■■ Appellants contend that respondent failed to rebut an inference of negligence arising from the application of the doctrine of res ipsa loquitur. This contention assumes that the evidence necessitated the jury to find that the res ipsa loquitur inference arose in this case. The Supreme Court said in *Danner* v. *Atkins*, 47 Cal.2d 327 [303 P.2d 724] : "It is ordinarily a question for the fact finder, first, whether facts which give rise to the res ipsa loquitur inference of negligence actually exist and, second, if the inference arises, whether it prevails or is overcome."

In *Siverson* v. *Weber*, 57 Cal.2d 834, the Supreme Court said at page 839 [22 Cal.Rptr. 337, 372 P.2d 97] : "The fact that a particular injury suffered by a patient as the result of an operation is something that rarely occurs does not in itself prove that the injury was probably caused by the negligence of those in charge of the operation. [Citations.] . . . To permit an inference of negligence under the doctrine of res ipsa loquitur solely because an uncommon complication develops would place too great a burden upon the medical profession and might result in an undesirable limitation on the use of operations or new procedures involving an inherent risk of injury even when due care is used. Where risks are inherent in an operation and an injury of a type which is rare does occur, the doctrine should not be applicable unless it can be said that, in the light of past experience, such an occurrence is more likely the result of negligence than some cause for which the defendant is not responsible."

■■■ *Surabian* v. *Lorenz*, 229 Cal.App.2d 462 at 466 [40 Cal.Rptr. 410] tersely states the same rule as follows: "The test of the applicability of res ipsa loquitur as established by *Siverson* is twofold. To prove that the result rarely occurs, standing alone, is not enough. It must also be shown

that the result is not an inherent risk of the operation or treatment.'' ▓▓▓ Here both medical experts called by appellants themselves testified that in a small percentage of cases an injection of penicillin result in an anaphylactic shock such as that suffered by the deceased and that it occurs in the absence of any negligence of the doctor. Substantial evidence in this case establishes that an anaphylactic shock, while rare, is an inherent risk in the use of penicillin. Apposite is the observation of the court in *Horace* v. *Weyrauch*, 159 Cal.App. 2d 833 [324 P.2d 666], where, in discussing a subcutaneous injection of a dye useful in radiology, which caused plaintiff's flesh to slough off, said at page 838: ''All the testimony is to the effect that the reaction here involved is one of the risks of such an injection. . . . Thus, there would seem to be no basis for the doctrine of res ipsa loquitur.'' We conclude that there was substantial evidence upon which the jury could find that the facts did not exist which would give rise to the res ipsa loquitur inference of negligence.

C. Alleged Acts of Negligence.

Appellants, in addition to relying on res ipsa loquitur, claim that substantial uncontradicted evidence proved a number of specific acts of negligence. ▓▓▓ Their primary contention is that the symptomatology of the deceased did not warrant the diagnosis made by the respondent and, therefore, it was negligent to prescribe and administer penicillin. More specifically they contend that the deceased at most had the symptoms of a common cold and to give penicillin on a prophylactic basis is malpractice. While it is generally conceded that administration of penicillin prophylactically for a cold virus only is not indicated, yet the uncontradicted testimony of respondent of the various symptoms upon which he diagnosed a ''flu syndrome'' sustained a diagnosis of infection for which the administration of penicillin is not malpractice. As previously stated, before administering the penicillin respondent ascertained that prior administration of penicillin had not resulted in any untoward results. Dr. Hewitt, a well qualified expert, called by respondent, testified in answer to a comprehensive hypothetical question embracing deceased's symptoms that it was within the standard of practice to administer penicillin.

Appellants' claim that to give penicillin intravenously, as distinguished from intramuscularly, is malpractice is answered by the uncontradicted testimony of respondent that the peni-

cillin injection was in fact given deceased intramuscularly and not intravenously.

█ Under the second general category of alleged negligence, i.e., treating the anaphylactic shock, appellants list five claimed violations of the standard of practice. From the evidence as a whole it appears that doctors live in deadly fear of anaphylactic shock and that when it happens it is a catastrophic event requiring immediate and drastic action to attempt to combat it. It further appears from the evidence that there is no one procedure in combating such a shock that may be said to be within the standard of practice but that varying procedures are acceptable as good practice. Here the respondent immediately and correctly diagnosed the shock and immediately undertook the procedures previously stated to combat it. The testimony of Dr. Hewitt was that the procedures undertaken and carried out by respondent were in accordance with the standard of practice of reputable physicians practicing in the community. We conclude there was substantial evidence to support the verdict.

## INTERROGATORIES

At the beginning of his opening argument to the jury at the close of the evidence, counsel for plaintiffs pointed out that the first issue in the case was negligence and said that "In this case you must break that down into three categories, generally speaking, that is, the decision to give penicillin, secondly, the treatment of anaphylactic shock, and thirdly, cardiac massage. So there are three general issues under negligence, giving penicillin, treating anaphylactic shock, and treating cardiac arrest." Before defendant commenced his argument and out of the presence of the jury, the trial judge advised counsel he was thinking of addressing three special interrogatories to the jury as follows: "Was there negligence in administering penicillin; was there negligence in treating shock; was there negligence in treating the heart arrest." Counsel for defendant said he would have no objection and counsel for plaintiffs did not voice any objection but said it was discretionary with the court. The interrogatories were prepared by the court and counsel for plaintiffs, without having made previous objection to their form, read them to the jury in his closing argument and following such reading he said to the jury: "Now, I think the Court will likewise indicate to you that if your answer to any one of those three, giving penicillin, treating anaphylactic shock, treating cardiac

arrest, is in the affirmative or yes, and if you decide that any one of those things proximately resulted in Mrs. Tangora's death, then the plaintiffs, the boy and his father, are entitled to a verdict. If you answer all of those in the negative, then Dr. Matanky would be entitled to your verdict." Following completion of the closing arguments and before the jury was instructed, at a conference out of the jury's presence, counsel for defendant requested the substitution of the term "malpractice" for "negligence" in the interrogatories which counsel for plaintiffs resisted. Again no objection was made by counsel for plaintiffs as to the form of the interrogatories. Counsel for plaintiffs at that time said: "in view of the special interrogatories which will be submitted to the jury, we do not have resolved the question of whether or not they can still find for the plaintiff even though they might only answer one of those in the affirmative." The court replied that the jury would be so instructed. The jury was then instructed including the reading of the three interrogatories as follows:

"'1. Was the defendant negligent in prescribing and administering penicillin?

"'2. Was the defendant negligent in treating anaphylactic shock?

"'3. Was the defendant negligent in treating heart arrest?'"

Following the reading of the interrogatories and as part of his instructions, the court said: "And as I believe one of the counsel pointed out in his argument, of course, if your answer to all of those is 'No' you will automatically be returning a verdict for the defendant. If your answer was 'Yes' you would find that issue of negligence in favor of the plaintiff. You would likewise have the other issues relating to proximate cause and damages before you." The jury retired to deliberate about 2:30 p.m. and having failed to reach a verdict by 5 p.m. was returned to the courtroom and the colloquy noted below took place between the court and a member of the jury.[1] The court having ascertained that the

---

[1] "MR. DOOLEY: Your Honor, there are three interrogatories. These are three separate questions. We are considering them separately as part of the same case, but individually. Do you want us to give to you a count on each of these questions? THE COURT: Yes, I would think so. MR. DOOLEY: Is my understanding correct in your instructions that on any one of those counts a vote of negligence is sufficient for a vote of negligence in the entire case? THE COURT: A vote of negligence on any one of the counts would be sufficient to establish negligence. There are the aspects of proximate cause and the aspects of damages which are also before you. MR. DOOLEY: So that in effect we could be split on

jury probably could not reach a verdict within a reasonable time that day, excused the jury to return the next court day which was the following Monday at 9 a.m. At said time the jury resumed their deliberations and at approximately 10:30 a.m., after the jury had been deliberating approximately four hours, counsel for plaintiffs submitted an instruction with respect to the interrogatories which was refused by the court, which refusal is assigned as error.[2] At 5:15 p.m. the jury returned a verdict for defendant and nine or more answered each interrogatory in the negative. In polling the jury on the general verdict, ten jurors answered that it was their verdict, two answered in the negative. On a poll of the interrogatories the jury was unanimous as to the first interrogatory; as to the second interrogatory, ten jurors answered it was their finding and two answered in the negative; and

---

the questions? We could be on one side in two of the questions and on the other side on the other? This may well happen. THE COURT: That is correct. If three-fourths of you determine all the elements in favor of the plaintiff, including one of the specifications of negligence, and the same three fourths determine the verdict, then that would be a proper verdict even though you might not be able to agree on the two other matters which have been submitted to you. MR. DOOLEY: That would only be in the case we are in favor of the plaintiff? If we are in favor of the defendant, then on all three matters we would have to be in agreement? We would have to vote, in effect, for a verdict on all three points? THE COURT: A defense verdict would be supported on all three points. It would have to be to find that verdict."

[2] "PLAINTIFFS' SPECIAL REQUESTED JURY INSTRUCTION No. 1
"With resepect to the interrogatories which I have submitted to you, and regarding your questions concerning the same, I hereby further instruct you as follows: 1. Said interrogatories are advisory only; they are not intended to necessarily cover all of the contentions of the parties; there is no requirement that each of you necessarily agree to each answer, whatever that answer might be. 2. Regardless of the phraseology of said interrogatories, or the fact that they have been submitted to you, plaintiffs who have suffered damage as a proximate result of some negligent conduct on the part of the defendant are entitled to recover compensation from the defendant. 3. It is not necessary to support a finding of negligence that every act or omission charged against defendant, or mentioned in said interrogatories, be proved. If by a preponderance of evidence it has been proved that any negligent conduct on the part of the defendant was a proximate cause of the death of Pauline Tangora, plaintiffs are entitled to recover. 4. Therefore, if any nine or more of you agree that any negligent conduct, and it need not necessarily be the same negligent conduct, on the part of defendant was a proximate cause of the death of Pauline Tangora, you shall fix the amount of plaintiffs' damages and return a verdict in their favor in that amount. 5. On the other hand, if nine or more of you agree that there was no negligence on the part of defendant which was a proximate cause of the death of Pauline Tangora, then you shall return a verdict in favor of defendant. 6. The foregoing instruction must be considered in the light of all of my other instructions, including those in which negligence was defined."

as to the third interrogatory, eleven jurors answered it was their finding and one juror abstained. The two jurors who answered the second and third interrogatories in the negative or who abstained were the same jurors who answered in the negative on the poll to the general verdict.

■ Appellants' contention that the court abused its discretion "in determining that special findings should be submitted to the jury after both counsel had made their final argument" is not sustained by the record. As previously pointed out the court indicated its intention of so doing at the close of plaintiffs' opening argument and plaintiffs' counsel had a copy of the interrogatories at the beginning of his closing argument. Here neither party was caught by surprise by the submission of the interrogatories by the court as part of its instructions to the jury and plaintiffs discussed the interrogatories in argument just as they discussed certain instructions to be given. The submission of interrogatories by the court is discretionary as is the time of such submission provided it is not later than the rendition of the general verdict. Cf. *Vivion* v. *National Cash Register Co.*, 200 Cal.App.2d 597, 602 [19 Cal.Rptr. 602] ; *Fresno Canal etc. Co.* v. *Warner*, 72 Cal. 379, 381 [14 P. 37].

■ Appellants' contention that the phraseology of the interrogatories was inaccurate, unfair, unplain, and in effect directed a verdict for respondent is unconvincing. Appellant argues that, as phrased, the second and third interrogatories compelled negative answers to the question "Was the defendant negligent in treating, etc." for the reason that it was not contended defendant was negligent in the fact of treating the shock and heart but was negligent in the manner of such treatment. In the first place, the interrogatories were virtually paraphrased from plaintiffs' opening argument that "there are three general issues under negligence, giving penicillin, treating anaphylactic shock, and treating cardiac arrest." To argue that jurors would misconstrue the interrogatories as argued by plaintiffs is to deny them even a modicum of intelligence after days and days of evidence relating to manner in which defendant treated the shock and heart arrest.

■ Appellants' further contention that the court erred in refusing to give the instruction, heretofore footnoted, submitted by the plaintiffs after the jury had been instructed and had deliberated for several hours is not tenable. Plaintiffs knew the exact form of the interrogatories before commencement of the closing argument and made no request for any

explanatory instruction nor that they be permitted time before the jury was instructed to consider the need for any further instructions.

Appellants' principal thrust as to the interrogatories is that their submission to the jury together with the colloquy between the court and a member of the jury "did away with the doctrine of *res ipsa loquitur*" upon which the jury had been instructed by restricting them to a consideration of what appellants refer to as three isolated instances of activity. As we have previously pointed out, there was substantial evidence from plaintiffs' own witness from which the jury could have found that the conditions necessary to an application of the doctrine of res ipsa loquitur had not been established.

It is pure speculation to argue that the special interrogatories did away with the res ipsa loquitur instruction because the jury may never have applied the res ipsa rule at all for lack of proof of the necessary foundational facts. Additionally, the court gave BAJI Instruction No. 2 that no single instruction is to be singled out but that the jury is to consider all the instructions and to regard each in the light of all the others.

### INSTRUCTIONS

Appellants requested BAJI Instruction No. 101-B dealing with standard of care. This instruction as submitted is entirely inapplicable to a malpractice action. The court modified it by substituting the word "physician" for the word "person." Appellants contend this eliminated from consideration the conduct of defendant's employees but we are not directed to any evidence of negligence of any assistant or employee of defendant to which the instruction could relate in its unmodified form. Appellants' contention of error in instructing on burden of proof, the giving of BAJI No. 180 and the refusal to give BAJI No. 35-A is untenable. Failure to give BAJI No. 214-Q (New) and No. 214-P (Revised), dealing with free and informed consent, was not error as there was no evidence that the standard of practice in the community required that a doctor, before giving a patient an injection of penicillin, advise the patient that in rare instances anaphylactic shock may occur and result in death. Respondent testified that in fact it was not the practice. Refusal to give BAJI Instruction No. 101-C was not error. This is a general instruction on negligence and not applicable to a malpractice action. The instructions given adequately covered the standard of care in a malpractice action. Nor was it error to refuse

BAJI No. 101-F as the court told the jury if they found for plaintiffs on any one or more of the special interrogatories together with a finding of proximate cause and damages, they should return a verdict for plaintiffs.

### ERRORS IN ADMISSION AND REJECTION OF EVIDENCE

Answering a question as to the purpose of a report given to an attorney for deceased in connection with the automobile accident, the respondent testified the attorney asked him if the death was due to the injuries sustained in the accident ''because there was a problem of collection on insurance in relation to double indemnity if the death was due to the accident.'' Plaintiffs' motion to strike as hearsay was denied. No request was made that the jury disregard the reference to insurance; no motion for mistrial was made; no instruction was submitted to disregard any reference to insurance and no further allusion was made to insurance. Having made no attempt to cure any conceivable prejudice at the trial, we are not impressed by this belated claim of error.

One of the principal grounds of alleged malpractice was defendant's failure to administer adrenalin or epinephrine intravenously following the anaphylactic shock. In addition to witnesses' testimony on this subject, plaintiffs introduced a bottle of penicillin and an instruction sheet as to its use, which, after warning against its use intravenously, stated that resuscitative drugs such as epinephrine should be ''readily available for emergency intravenous administration.'' Over plaintiffs' objection defendant introduced a bottle of epinephrine the instructions on which read ''Intramuscular only.'' While there was no evidence that defendant had used that particular bottle yet he testified in substance that a substantially similar label was on bottles of all brands of epinephrine. It appears to us that this was proper evidence in rebuttal of any inference from the statement in the penicillin brochure as to how epinephrine should be administered.

Plaintiffs contend they were denied the right to cross-examine defendant on the use of neutrapen in treating anaphylactic shock. Defendant was in fact examined at length on the use of this drug and why he did not use it in this case. We are not referred to any ruling of the court nor do we find one which restricted the proper cross-examination of defendant on this subject.

Plaintiffs' final claim of error as to evidence is the alleged refusal of the court to compel respondent to answer questions

propounded and in refusing to strike nonresponsive testimony. Defendant was being examined on the subject of the relative sensitivity of people to different types of penicillin. There was in fact no motion to strike any alleged nonresponsive answer nor any question which defendant refused to answer on this subject nor any request to the court to compel an answer.

### Conclusion.

The trial of this case, including selection and deliberation of the jury consumed nine court days. The evidence covers approximately 1,111 pages of reporter's transcript. Plaintiffs were vigorously represented by counsel obviously well versed on every medical problem involved. Tragic as it may be that death resulted from the administration of a commonly used and highly beneficial drug, the evidence, notwithstanding some conflicts, clearly sustains the verdict that the death was not proximately caused by any negligence of defendant in prescribing and administering the penicillin nor on his treatment of the anaphylactic shock and heart arrest or in any other way.

The appeals from the order denying appellants' motion to tax costs and from the order granting respondent's motion to strike affidavits filed in support of appellants' motion for new trial are dismissed, having been expressly abandoned by appellants. Judgment affirmed.

Shinn, P. J., and Files, J., concurred.

A petition for a rehearing was denied January 21, 1965, and appellants' petition for a hearing by the Supreme Court was denied February 17, 1965. Mosk, J., was of the opinion that the petition should be granted.