[Civ. No. 28572. Second Dist., Div. One. May 11, 1966.]

LILLIE OTHELLO DUNLAP et al., Plaintiffs and Appellants, v. WALLACE C. MARINE, JR., et al., Defendants and Respondents.

164

Lionel T. Campbell and Benjamin D. Mathon for Plaintiffs and Appellants.

DeForrest Home, Overton, Lyman & Prince, Ried Bridges, Kirtland & Packard and Judith O. Hollinger for Defendants and Respondents.

LILLIE, J.—In this malpractice action, tried without a jury, the court found in favor of defendant Marine, an obstetrician, defendant Johnson, an anesthesiologist, and defendant hospital. Plaintiffs appeal from the judgment and order denying their motion for a new trial. Another defendant, likewise a physician, was granted judgment under section 631.8, Code of Civil Procedure, at the conclusion of plaintiffs' case, but no appeal has been taken therefrom.

The asserted malpractice resulted in a cardiac arrest suffered by Mrs. Dunlap, then 26 years of age, during the delivery of her third child, a 9 lb. 11 oz. baby, after more than 11 hours of hard labor. Her two other children, the first weighing 8 lbs. 13 oz. and the second 9 lbs. 2 oz., were born after she had been in labor for even longer periods; in each of the latter deliveries an inhalent anesthetic was administered. The present child was finally delivered vaginally after preparations had been undertaken for a caesarean section and a spinal anesthetic administered. Relying on certain statements

in *Quintal* v. *Laurel Grove Hospital,* 62 Cal.2d 154 [41 Cal. Rptr. 577, 397 P.2d 161],[1] also a cardiac arrest case, plaintiffs have filed an opening brief of some 170 pages, 96 of which are devoted to a summary of *all* the evidence, which necessarily includes that which is most favorable to them, disclosed by a reporter's transcript exceeding 2,500 pages; this, although it is the recognized rule that when an appeal is taken, as here, on the ground of the insufficiency of the evidence, all of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. ██ ''If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed.'' (*Estate of Teel,* 25 Cal.2d 520, 527 [154 P.2d 384].) Plaintiffs' departure from the above rule is defended by them on the ground that one of their major points on appeal pertains to the refusal of the trial court to make numerous specific findings, as requested by plaintiffs, which assertedly would indicate which of the conflicting versions or inferences on matters in conflict were believed by the trial court.[2] This brings us to the troublesome question of the general effect of the 1959 amendment to section 634, Code of Civil Procedure, and its bearing specifically on the present case. If due consideration was given to such amendment by the trial court and if, upon such consideration, specific findings were properly denied, we must necessarily take the appellate approach dictated by *Teel* and a host of other cases decided before and after that decision.

In *Mashon* v. *Haddock,* 190 Cal.App.2d 151 [11 Cal.Rptr. 865] (hearing in Supreme Court denied) this court held that the subject amendment did not change the normal rules on appeal when the sufficiency of findings is challenged: ''When findings are questioned, it is the duty of an appellate court to compare them with all the evidence in the case, to consider them as a whole, and to construe them liberally in support of the judgment.'' (P. 167.) Earlier, in *Lewetzow* v. *Sapiro,* 188 Cal.App.2d 841 [11 Cal.Rptr. 126] (hearing in Supreme Court

---

[1]The *Quintal* decision has been thus construed: ''The plaintiff need not produce evidence excluding all possible causes other than the defendant's negligence. When the defendant's negligence is one of several possible causes reasonably inferable from the evidence, the choice or rejection of that particular inference must be left to the jury. . . . Such a choice of inferences may be called 'conditional res ipsa loquitur.' '' (*Inouye* v. *Black,* 238 Cal.App.2d 31, 33-34 [47 Cal.Rptr. 313].

[2]It further follows, say plaintiffs, that if the request had been acted upon and the trial court had believed the version favorable to them, the ultimate findings would not have been sustained.

denied), Justice Tobriner thus interpreted the same amendment: "It is axiomatic that a finding of ultimate fact embraces the necessary probative facts to sustain it. Inclusion of evidentiary facts would add nothing of value and would needlessly embellish the structure of the fin'dings with rococo details." (P. 845.) *Wisler* v. *Wisler,* 198 Cal.App.2d 511 [17 Cal.Rptr. 813], and *Wishart* v. *Claudio,* 207 Cal.App.2d 151 [24 Cal.Rptr. 398] (hearing in Supreme Court denied), are to the same general effect. Subsequently, however, in *Garber* v. *City of Los Angeles,* 226 Cal.App.2d 349 [38 Cal.Rptr. 157] (hearing in Supreme Court denied), the court declared that the background of the legislation resulting in the amendment made evident its purpose, namely, "to discourage the mere finding of so-called ultimate facts when such method left counsel and the appellate court unable to determine the trial court's resolution of the conflicting facts needed for a factual determination of the case." (P. 355.) The action involved a claim for injuries allegedly caused by the defective condition of a public sidewalk; plaintiff had to show notice of the defect to defendant municipality and offered testimony that a neighbor had fallen at the same location because of the si'dewalk's then condition. The trial court was specifically requested to find on the factual issue of the previous fall; refusing to do so, it found only on the ultimate fact of no notice to the city of the defect, either actual or constructive, relying on the holdings in *Wishart* as well as *De Vrahnos* v. *George,* 203 Cal.App. 2d 210, 222 [21 Cal.Rptr. 481] (hearing in Supreme Court denied) which latter case cited *Mashon* and *Lewetzow* in reaching its determination. According to *Garber* (p. 356), "the fact of the previous accident . . . was one of the material facts prerequisite to the determination by the court that the condition of the sidewalk was hazardous and that such hazard had existed for five years," a period of time sufficient to impute notice to the city. Continuing, "Since a special finding was requested as to whether or not the accident to the witness at the same location did occur, failure to so find requires that this court may not infer that such accident did not occur. (Code Civ. Proc., § 634.)" Again, in *29 Palms Van & Storage* v. *Los Angeles Met. Transit Authority,* 221 Cal. App.2d 183 [34 Cal.Rptr. 430], the court awarded damages in the sum of $3,600 without segregating the damages claimed to be general and those which were special. More detailed findings were requested and denied. The appellate court, citing section 634, remanded the matter for proper findings; pointed

out it was the established rule that where both general and special damages are claimed, "it is the duty of the trial court, if it finds for plaintiff, to find separately the general damages and the several categories of special damages." (P. 185.)

Plaintiffs appear to argue that *Garber* and *29 Palms*, determined after *Mashon, Lewetzow* and *Wishart*, represent a new trend in the construction of section 634. A still later case, *Smith* v. *McDaniel*, 228 Cal.App.2d 275 [39 Cal.Rptr. 544], is also relied on for the same proposition; a quiet title proceeding, it involved claims of adverse possession. The judgment was reversed with directions to make a finding on the issue: "The issue is a decisive one because if respondents' use of the two parcels was in fact purely permissive and nothing appeared to give notice of any claim on their part, then possession would not be adverse." (P. 279.) In all of these cases, however, the subject matter of the special findings went to the very heart of the lawsuit. Thus, in *Garber* it involved one of the material facts "prerequisite" to recovery or denial of plaintiff's claim; in *Smith*, it was "decisive" or dispositive of the claim of adverse possession, while in *29 Palms* the judgment, as rendered, was wholly unsupportable for reasons pointed out by the court. Here, however, a painstaking examination of the more than 100 specific findings requested (and denied) places many of them in the category described by *Lewetzow* as "embellish[ment] . . . with rococo details." The remainder are either covered by the findings rendered or relate to issues immaterial to the determination of the case.

An example of the type last mentioned is the request for a specific finding as to the cause of the cardiac arrest: "78. What was the cause of plaintiff's cardiac arrest, based upon reasonable medical probability or reasonable medical certainty?" But it is pointed out in *Dierman* v. *Providence Hospital*, 31 Cal.2d 290 [188 P.2d 12], that the defendant has fulfilled his duty upon a showing of "such care in all possible respects as necessarily to lead to the conclusion that the accident could not have happened from want of care, but must have been due to some unpreventable cause, *although the exact cause is unknown.*" (Italics added.) (P. 295.) (See also, *Davis* v. *Memorial Hospital*, 58 Cal.2d 815, 818 [26 Cal.Rptr. 633, 376 P.2d 561].) The court was also asked to find (No. 77) "the proximate cause of the plaintiff's cardiac arrest. Was there more than one proximate cause of the cardiac arrest, and if so, what was it." Plaintiffs apparently are urging the existence here of concurring causes either one of which operat-

168

ing alone would have been sufficient to cause the result. However, "[T]he proper rule for such situations is that defendants' conduct is a cause of the event as it is a material element and a substantial factor in bringing it about. [Citations.] Whether it was such a substantial factor is for the jury to determine unless the issue is so clear that reasonable men could not differ. In the instant case, it is clear that the medical experts differed as to the nature and cause of the unusual disease which caused plaintiff's condition." (*Thomsen* v. *Rexall Drug & Chemical Co.*, 235 Cal.App.2d 775, 783 [45 Cal.Rptr. 642].) *Quintal* holds that in the cardiac arrest situation there presented conditional res ipsa loquitur applied, the injury being "very rare . . . It . . . could result from negligence, or could result without negligence. Is it more probable than not that it was the result of negligence? That is the question." (62 Cal.2d 154, 164.) As will be shown hereinafter, the trial court considered the applicability of the above doctrine, expressly finding that "the respiratory difficulty, cardiac arrest and damage sustained by said plaintiff in this case *was not* [*sic*] *more probably than not the result of any negligence, malpractice or lack of care* on the part of any defendant, or the agent or employee of any defendant." (Italics added.) The *Quintal* question having been answered in *Quintal's* exact language, the directive of that decision was complied with as to proximate causation. Certainly nothing is said, or intimated, in the same case as to the necessity for the elaborate evidentiary special findings insisted upon by plaintiffs here. ▪ After all, this is basically an action for negligence; in such proceedings, "findings upon merely evidentiary facts are unnecessary, and if made are surplusage." (*Wishart* v. *Claudio, supra*, 207 Cal.App.2d 151, 153.)

▪ Still another example of specific findings that were covered by the findings eventually rendered relates to Mrs. Dunlap's consent to the injection of the anesthetic by defendant Johnson; specifically, whether he made a proper preanesthetic visit with this defendant, took a proper history and thereafter determined whether she had any fears that would contraindicate spinal anesthesia. We do not enumerate them all for reasons, among others, that the element of repetitiousness appears therein. Thus, No. 10 asks: "Whether defendant JOHNSON secured any consent from the plaintiff LILLIE and if so, at what time and under what circumstances was such consent obtained and by what language or words or other conduct was such consent obtained." And No. 11: "Whether

the consent to a spinal anesthesia by plaintiff LILLIE was obtained by her silence when she was purportedly told she was to get a spinal anesthetic, and if so, what was the physical, mental and emotional condition of the plaintiff at such time.'' Parenthetically, all of the above matters are clearly evidentiary in nature. Be that as it may, with respect to these last two inquiries, the trial court found ''That it is not true that defendants, or any of them, failed to obtain the consent of plaintiff Lillie Othello Dunlap to the administration to her of a spinal anesthetic . . . and on the contrary, the Court finds that such permission and consent was in fact obtained.'' With respect to plaintiffs' insistence upon a finding as to the taking of a case history, etc., the trial court found that defendants ''did in fact possess, exercise and use that degree of learning, skill, knowledge and diligence ordinarily possessed and exercised by such doctors . . . in this community at the time and under like circumstances.'' While the phrase ''shall fairly disclose'' in section 632, Code of Civil Procedure, with which section 634 must be read, is not ''susceptible of any accurate yardstick'' (34 State Bar J. 639), its purpose is to insure ''an accurate review of the legal issues as applied to the facts found.'' (*Ibid*, 639.) Since we have no difficulty, with the findings rendered here, in making that accurate review, the specific findings were properly denied; accordingly, the recital of the facts which follows is in keeping with the mandate of *Teel, supra* (25 Cal.2d 520, 527.)

Mrs. Dunlap was admitted to defendant hospital shortly before midnight on April 2, 1959, after her husband had advised Dr. Marine by telephone that regular labor pains had started. Her prepregnancy weight had been 220 lbs., but on her first visit to Dr. Marine she weighed 256½ lbs. He tried to have her reduce, instructing his patient to go on a 1,000-calorie-a-day diet. The greater the obesity, the doctor testified, the more the risks expected from the use of any anesthetic as well as postpartum hemorrhage. Notwithstanding his instructions, the patient weighed 262 lbs. at her last visit prior to delivery. On January 27 an X-ray disclosed a single fetus, the size of which suggested maturity and led Dr. Marine to expect that she would deliver an exceptionally large child some eight weeks hence. On the same date he discussed with her the anesthesia he planned to use, stating that she would probably receive a spinal. There being no contraindications to that type of anesthetic, its use was indicated because of the anticipated size of the baby and, among other reasons stated, the need for a maximum relaxation of the perineal muscles.

About 3 a.m. Dr. Marine was notified by a nurse at defendant hospital that the cervix was dilated 1 cm., the head of the baby was at minus 2 station with regular heart tones,[3] the patient's contractions were every five minutes, and the bag of water intact. At 4:30 a.m. the nurse reported to the doctor that the patient was 3 cm. dilated, but the station had regressed from minus 2 to minus 3. Dr. Marine arrived at the hospital about 6:30 a.m. and examined the patient about 30 minutes later. Dilation was then 4 cm., contractions were every three or four minutes and the head was at minus 2 once again. During this examination Dr. Marine ruptured the bag of water to facilitate progress. Immediately thereafter, contractions increased to every two or three minutes. Additional labor analgesia was then prescribed, consisting of demerol and phenergan.

At 8:45 a.m., Dr. Marine found no further progress; he then made a note in the progress record to "prepare for probable C section." At 9 a.m. he also made a note "large single infant with probable cephalopelvic disproportion" because of a large fundus, hard contractions (lasting 45 seconds) every two or three minutes, labor which had lasted more than nine hours with no progress during the last two hours thereof. Shortly after 9 a.m. he spoke with Mr. Dunlap and procured his consent (by signature) for a caesarean section.[4] He told Mr. Dunlap that since his wife was not making progress, she would probably have to have a caesarean section; and that they could not allow labor to continue indefinitely because of possible injury to both baby and mother; and that his wife would receive an anesthetic from an anesthesiologist. During the course of this conversation, Mr. Dunlap did not state that his wife did not want a spinal.

Either immediately before or after his conversation with Mr. Dunlap, Dr. Marine telephoned the anesthesia office of the hospital and asked them to send down an anesthesiologist for a caesarean section. Thereafter, defendant Johnson was called by a surgical nurse who told him that his services were needed in the caesarean section delivery room.

Dr. Marine next examined the patient at 10:50 a.m. At that time the cervix had dilated to 8 cm. (effacement being com-

---

[3] The "station" refers to the level of the baby's head, with zero being at the ischial spines—positions above that being "minus," and those below "plus." Accordingly, at "plus 4" the head is "crowning" or at the point of delivery.

[4] No consent was presented to the patient for signature since it was the practice of the hospital not to ask for a consent from the patient if sedation had been administered within the preceding 24 hours.

plete) but the fetal head remained at minus 2 station. Thereupon he ordered the patient "lined up for a Caesarean section."[5] Nurses then began surgical preparation ordered by Dr. Marine, and the patient was moved from the delivery room at approximately 11:35 a.m. Prior thereto, dilation had increased but the fetal head remained at minus 2 station in the maternal pelvis.

While the patient was still in the labor room, Dr. Marine met Dr. Johnson in the hallway. He told Dr. Johnson that the patient had been in labor for a number of hours, that she was not making adequate progress and that he had scheduled her for caesarean section because of probable cephalopelvic disproportion. He also stated that the patient was extremely obese, that she was apprehensive and he had arranged necessary blood for transfusion if required. Dr. Johnson stated that he would use spinal anesthesia, and Dr. Marine concurred. He was then introduced to the patient by Dr. Marine, and advised her that he was going to administer spinal anesthesia. In his opinion, the prior administration of demerol and phenergan to the patient would not influence his dosage of any anesthetic. He took and recorded the patient's blood pressure; the reading did not disclose any hypertension. Upon the basis of such findings, he concluded that spinal anesthetic could be utilized, there also being numerous contraindications to the use of inhalation anesthesia.

Preparations for C-section surgery and spinal anesthesia were then completed. The patient cooperated for the spinal anesthetic by turning onto her right side—Dr. Johnson had previously adjusted the table to a reverse Trendelenburg position so that the patient's head was higher than her hips and feet. Dr. Johnson first attempted without success to insert a spinal needle at the L3-L4 interspace, a local anesthetic (procaine mixed with vasoxyl) having been previously administered to raise blood pressure in anticipation of a drop in blood pressure which the spinal might cause. The patient was then moved to a sitting position with her feet off the right side of the table resting on a stool; after further unsuccessful attempts at the L3-L4 interspace, a spinal puncture was finally effected at the L2-L3 interspace. A syringe was attached to the

---

[5]Dr. Marine testified that when he made this decision, he had in mind the hospital rule which required consultation by a member of the staff for a first time C-section, notwithstanding the fact that he considered Mrs. Dunlap's case to be in the nature of an emergency and a consultation not required. He tried to reach Dr. Lewis Boddie for such a consultation, but the latter was not available.

needle, and the patient was administered 8 milligrams of pontocaine which had been mixed with 10 percent glucose solution and 1 cc. of the patient's spinal fluid; the injection was made immediately after a labor contraction. According to Dr. Johnson, he desired anesthesia to the T6 or T7 level.

After the injection of the above ingredients, the patient was left in a sitting position for about two minutes; she was then moved to a supine position, the plane of the table again being reverse Trendelenburg. It then became apparent that the fetal head was crowning and that the child would be delivered vaginally. Stirrups were placed on the table so that the patient could be put into a lithotomy position.[6] Dr. Marine then did an episiotomy, an incision of the perineum between the vagina and the anal orifice, so that the patient would not tear. He observed that the blood was dusky or cyanotic, but he had seen no evidence of lack of oxygen or hypoxia before making the above incision. Hypoxia, Dr. Marine testified, is one of the commonest causes of cardiac arrest. Thus, if there is insufficient oxygen, a person may develop hypoxia; or it may result if the anesthetic rises too high. When the presence of cyanotic blood was reported to Dr. Johnson, oxygen was then forced into the patient's lungs to assist her respiratory efforts. An extra-jugular vein injection of vasoxyl was also administered by Dr. Johnson.

Although Dr. Johnson was able to obtain a pulse until the child was born, immediately after delivery it became more difficult to palpate. When Dr. Marine manually removed the placenta, he was unable to palpate a pulse in the larger vessels; it was at that time, he assumed, that a cardiac arrest had occurred.

The following time sequence was subsequently recorded: Spinal anesthesia administered at 11:30; patient turned on back, crowning, prepared for vaginal delivery at 11:45 a.m.; cyanotic blood noted in the episiotomy incision at 11:52 a.m.; the baby was delivered at 11:55 a.m.; the placenta was delivered, cardiac arrest was noted and the chest was opened at 12 noon.

As soon as the cardiac arrest was diagnosed, Dr. Marine took a scalpel and opened the left side of the patient's chest to facilitate internal cardiac massage or pumping of the heart; as he did so, he also issued an emergency call for assistance. Dr.

---

[6]This position is achieved when the thighs are at an approximate 90 degree level to the trunk of the body, the knees being propped in stirrups and the lower legs extended.

Johnson, in turn, inserted an endotracheal tube through the patient's mouth to provide an airway for oxygen; it was connected to a machine previously used for another purpose. Within one minute Dr. Marine was able with both hands to massage or pump the heart manually; he did not, however, open the pericardial sac that envelops the heart.

Two doctors arrived shortly after 12 o'clock in response to the emergency. One of them, Dr. del Junco, took over the cardiac massage for Dr. Marine. Shortly thereafter, he opened the sac and injected adrenalin into the heart muscle. Cardiac massage was then continued; at 12:10 p.m. there were spontaneous heart contractions in rhythm. After the spontaneous heartbeat was observed, Dr. Marine closed the episiotomy wound while Dr. del Junco repaired the chest incision. The endotracheal tube was removed by Dr. Johnson.

The balance of this recital is devoted to expert testimony, pro and con. Initially, Dr. Marine stated that cardiac arrests occur even if the doctor knows all the common causes and has all the facilities at his disposal. In the present case, in his opinion, it was possibly caused by an embolus or clot. The possibility of a berry aneurysm was also considered; however, in the absence of an autopsy, he could give no definite cause for the heart arrest. Each side called an anesthesiologist and an obstetrician to answer hypothetical questions propounded to them. ■ The testimony of plaintiffs' expert in the field of obstetrics was accorded no weight for reasons orally given by the trial court at the conclusion of the whole case—that was the court's prerogative as the trier of fact. Plaintiffs' other expert (Dr. Lorhan), an anesthesiologist, testified that Dr. Johnson's failure to take a medical history and conduct a physical history prior to the administration of the anesthetic was not good medical practice; but his omission had no causal connection with the cardiac arrest. While he also testified that in approximately 15 percent of cardiac arrest cases no medical cause can be given therefor, in his opinion the arrest in the present case was due to a high spinal anesthesia (reaching levels of almost T-4 or T-6). On cross-examination, however, Dr. Lorhan testified that he did not know from which levels the uterus took its nerve innervation, nor did he assume that the patient reacted by bucking on the endotracheal tube within 20 minutes of the cardiac arrest.

Defendants called Dr. Robert McNeil, an expert in the field of obstetrics and gynecology. He rendered the opinion that Dr. Marine conformed to the standards of practice at that time

among reputable physicians in the community; that a caesarean section was indicated in view of potential injury to the child. Under such circumstances "it is not required by the standard of practice in this community to have the doctor wait for a consultation . . . if he knows that the facts of the circumstances are clear-cut," such standard not being affected by any rules which a hospital might inaugurate for their staff. "The responsibility of a physician," he added, "is to the patient." He also testified that the employment of spinal anesthesia was good practice; and that a spinal was the anesthetic of choice for utilization under the facts in the hypothetical case.

Dr. McNeil further testified to his familiarity with the nerve supply to the organs of the female pelvis and to the nerves from the vertebral segments which provide motor innervation to the uterus, there being accessory fibers from the fourth thoracic vertebra downward. The major portion of the innervation of the uterine fundus, according to the witness, came from the level of the thoracic vertebra No. 9. For the hypothetical patient to expel the fetus from her uterus, there would necessarily be strong uterine contractions, and the highest level to which motor anesthesia could have been accomplished in this case would have been thoracic vertebra No. 9. Accordingly, if motor anesthesia were present to the level last mentioned, he would expect sensory anesthesia to extend to about the thoracic 7 segment or xyphoid.

Defendants' other witness, Dr. Forrest Leffingwell, was an expert in the field of anesthesia. In his opinion, the hypothetical anesthesiologist should have elicited a complete history of the patient by interviewing her or her relatives; the results of his physical examination should also have been recorded. However, these departures from good practice did not contribute to nor cause the cardiac arrest, since a spinal anesthetic would have had to be utilized if the hypothetical anesthesiologist had in fact complied with all good standards. He further testified that the anesthesiologist, under the hypothesis offered, violated no standard with respect to the issue of consent—when the patient was informed that she would receive a spinal, she voiced no objection and eventually cooperated.

Dr. Leffingwell also was of the opinion that the spinal anesthesia did not cause, nor contribute to, the cardiac arrest; in short, for reasons to be given, it was a medical impossibility. He reasoned that if the anesthetic level had progressed high enough to produce respiratory paralysis, such level would have

obliterated uterine activity—such was not the case under the hypothetical facts. Significantly, according to the witness, within 10 minutes after the cardiac arrest (at which time a spontaneous heartbeat was restored), the patient's respirations were also spontaneous. These respirations would not have been possible if, 10 minutes before the cardiac arrest, the level of anesthesia had been too high. In the doctor's experience, if the spinal anesthesia stayed below T-10 or T-9, uterine contractions will continue; but if the anesthesia goes above that level, the contractions become ineffective under conditions where the anesthesia precedes the T-6.

The presence of spontaneous respirations immediately following cardiac resuscitation also indicated to Dr. Leffiingwell that the anesthesia administered at 11:30 a.m. did not cause the cardiac arrest at 11:55 a.m. since the duration of the effectiveness of the anesthetic's ingredients which were utilized will vary from an hour to an hour and a half at the minimum. Thus, the same condition present at the time of the cardiac arrest should have been present 15 minutes later when a heartbeat was restored.

Finally, in the opinion of this witness the most probable cause of the cardiac arrest here was some embolic phenomenon, the most likely being an embolism of amniotic fluid.

The foregoing recital indicates that plaintiffs' case was possessed of more substance with respect to defendant Johnson than either of the remaining defendants. As to him it is urged on appeal that (1) an inference of negligence arose under the doctrine of res ipsa loquitur which was neither met nor overcome, (2) as a matter of law, a negligently administered spinal anesthetic was the proximate cause of Mrs. Dunlap's injuries, (3) defendant Johnson administered the anesthetic without an informed consent and (4) the trial court erroneously restricted evidence upon Mrs. Dunlap's state of mind. (Heretofore determined has been the further point that specific findings were erroneously denied.)

In support of their first point, plaintiffs rely on *Seneris* v. *Haas*, 45 Cal.2d 811 [291 P.2d 915, 53 A.L.R.2d 124], where paralysis occurred after the giving of a spinal anesthesia, and *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, where general anesthesia was administered and cardiac arrest occurred. In *Seneris,* however, the case reached the appellate court after a judgment of nonsuit had been rendered below; and in *Quintal* the appeal was from a judgment notwithstanding the verdict. The rule applicable to the latter situation—

and it is the same as to nonsuits—is stated in *Quintal*: "Such a motion may be granted, properly, only when, disregarding the conflicting evidence, and indulging in every legitimate inference in favor of the plaintiff, the result is a determination that there is no evidence of substantial nature to support the verdict. The trial court, on such motion, is not permitted to weigh the evidence, and on an appeal from the judgment entered on the granting of such a motion, the appellate court must read the record in the light most advantageous to the plaintiff, resolve all conflicts in his favor, and give him the benefit of all reasonable inferences in support of the judgment." (P. 159.) Here, however, the appeal is from a judgment determining the sufficiency of the defenses offered by the respective defendants, and subsidiarily, the sufficiency of the evidence to sustain the court's formal findings in that regard. ■ Plaintiffs concede that the trial court did consider the doctrines discussed in both *Seneris* and *Quintal,* but they nonetheless argue that the inference of negligence was not overcome. But such questions were for resolution by the trier of fact upon conflicting testimony and conflicting inferences reasonably deducible therefrom. As shown above (*ante,* p. 168), the court expressly found in *Quintal's* language that the injury "was not [*sic*] more probably than not the result of any negligence . . . on the part of any defendant. . . ." Having so found, the trial court's obligation was discharged. ■ Plaintiffs are simply asking this court to weigh the evidence received and considered below. But this function is not ours under settled principles of appellate practice and in light of the fact that the testimony offered by the defendants is neither incredible nor medically unsupportable.

In our discussion of the denial of plaintiffs' requested findings, we also adverted to the claim, plaintiffs' next point, that as a matter of law a negligent administration of the anesthetic was the proximate cause of the happening here. As then mentioned, plaintiffs are urging that there may be more than one proximate cause of the present happening. ■ However, as also mentioned earlier, defendants have fulfilled their duty upon a showing that the accident was not due to their negligence but resulted from some unpreventable cause "although the exact cause may be unknown." (*Davis* v. *Memorial Hospital, supra,* 58 Cal.2d at 818.) ■ Upon substantial evidence, defendant Johnson established that the cardiac arrest was not caused by the anesthetic; he was not required to show the exact cause which in fact proximately contributed to the occurrence.

Plaintiffs rely on *Salgo* v. *Leland Stanford etc. Board of Trustees*, 154 Cal.App.2d 560 [317 P.2d 170], for their next contention that there was no evidence to support the finding that the consent to C-section and the anesthetic was both intelligent and informed. ▬ In *Tangora* v. *Matanky*, 231 Cal. App.2d 468 [42 Cal.Rptr. 348], however, it is held that the question of such consent turns on the issue of whether the physician was then acting in conformity with recognized practices in the community. There was no evidence here that there was any deviation from the standard of practice.

▬ Finally, it is contended that the testimony of Mr. Dunlap and others of Mrs. Dunlap's apprehension regarding spinal anesthesia was unduly limited to a showing of her state of mind. This went to the forming of an informed consent. The record shows, however, that such testimony of apprehensiveness was considered by the trial court in arriving at the particular finding in question. We perceive no error of a prejudicial nature.

Each of plaintiffs' contentions as to defendant Johnson being without merit, we come to the asserted liability of defendant Marine under the circumstances at bar. Plaintiffs argue that defendant Johnson was his agent, citing *Ybarra* v. *Spangard*, 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258], and *Seneris* v. *Haas, supra,* 45 Cal.2d 811. ▬ The situation in those cases is distinguishable from that at bar;[7] but, be that as it may, defendant Marine is clearly not liable under *respondeat superior* unless defendant Johnson committed actionable negligence. The question therefore remains whether he was independently responsible for the injury here sustained. As in *Quintal,* the facts are pertinent to more than one defendant— in this case, so are the controlling rules of law. ▬ Heretofore we have determined that the trial court, upon conflicting testimony, properly concluded that any inference of negligence was dispelled, applying the principles discussed in *Quintal* and *Seneris.* The testimony of Dr. Leffingwell supported Johnson's defense; that of Dr. McNeil applied favorably to Dr. Marine's position at the trial. Too, if the questions here relating to Dr. Johnson involve factual determinations as to lack of consent and proximate causation, similar issues apply to the case of defendant Marine. So, as to lack of consent to the C-section, we need only refer to the *Tangora*

[7]Defendant Marine asserts that "there is no case in California that holds, as a matter of law, that the obstetrician is responsible for the conduct of an anesthetist."

178

decision, *supra* (231 Cal.App.2d 468) ; the same rule controls. The judgment exonerating defendant Marine must be held to be supported.

■ There remains for determination the liability of the defendant hospital. Manifestly it is sought to hold this defendant on the theory that the two individual defendants were its agents. Ordinarily the question of such agency is a fact question, but we need not decide that issue since we have demonstrated that neither of the doctors is responsible under the record before us for the happening complained of. It follows, of course, that the hospital cannot be liable.

For the foregoing reasons, the judgment is affirmed; the attempted appeal from the order denying a new trial is dismissed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied June 1, 1966, and appellants' petition for a hearing by the Supreme Court was denied July 6, 1966.