HOOTEN v. STATE USE CROSS COUNTY.

## Opinion delivered June 21, 1915.

1. CONVERSION—BANK DRAFT.—A draft, drawn on a bank, may be the subject of conversion. Anything which is the subject of property, and is of a personal nature, is the subject of conversion.

2. CONVERSION—WHAT CONSTITUTES.—Any distinct act of dominion, wrongfully exerted over another's property in denial of his right, or inconsistent with it, is a conversion.

3. CONVERSION—BANK DRAFT.—A county treasurer, being short in his account, procured, through H. and G., a draft from a certain bank, payable to the treasurer, individually, to be used in his settlement with the county; the county court required the treasurer to endorse the draft to himself as treasurer. The three parties then returned the draft to the bank from which it had been procured. Held, when the draft was delivered to the county treasurer, individually, it became his property, and when he endorsed it to himself as treasurer, it became the property of the county, and when it was returned to the bank, the three parties were guilty of a conversion of the money represented by the draft, and became liable for the same to the State for the use of the county.

4. CONVERSION—BANK DRAFT—LIABILITY OF BANK—KNOWLEDGE OF CASHIER.—Where the cashier of the drawer bank, knew the facts so set out above, the bank also will be liable for the conversion of the draft, upon receiving back the draft.

5. BILLS AND NOTES—PURCHASER OF UNENDORSED CHECK—TITLE.—The purchaser of a check who obtains title without the endorsement of the payee, holds it subject to all equities and defenses existing between the original parties, even though he has paid full consideration, without notice of the existence of such equities and defenses.

6. BILLS AND NOTES—UNENDORSED DRAFT—PUBLIC FUNDS.—A draft was made payable to H., he endorsed the same to himself as treasurer of Cross County. Held, a bank which thereafter received the draft without further endorsement, took the same with knowledge that the funds, represented by the draft, were the property of the county.

7. CONVERSION—BANK DRAFT—INTEREST.—Interest may be added on property converted from the date of the conversion.

8. SURETY BOND—EXECUTION—AUTHORITY OF LOCAL AGENT.—A surety bond, executed by a local agent, without authority, will not be bind-

ing on the company, where the bond was for the benefit of the county, and the county judge had knowledge of the lack of authority of the local agent.

9. SURETY COMPANIES—UNAUTHORIZED ACT OF AGENT—REPUTATION.—The local agent of a surety company, executed a bond as surety for a county official, and held, under the evidence, that the surety company did not ratify the unauthorized act.

Appeal from Cross Chancery Court; *Charles D. Frierson,* Chancellor on exchange; reversed in part; affirmed in part.

*Benjamin Harris* and *Gordon Frierson,* for appellant Merchants & Planters Bank & Trust Company.

1. Liability can not be fixed upon this appellant on account of the conduct or the knowledge of Hooten and Going. They at no time in the transaction acted or assumed to act for the bank, or in their capacity as directors or officers of the bank. 57 Fed. 20; 118 Fed. 789; 6 Am. & Eng. Ann. Cases 675.

The principal is liable for the tortious acts of agents only when the same are done in the course of their employment. 75 Ark. 579; 31 Cyc. 1584.

2. The fact that Frayser at one time discussed with Going the matter of the bank's signing Hammett's bond is a circumstance which can only afford ground for suspicion or conjecture, and is not sufficient to prove fraud. 11 Ark. 378; 9 Ark. 482; 22 Ark. 184; 96 Ark. 65.

Fraud will not be inferred where a statement may as well have been made from a good motive as from a bad, or where an act may as well have been done from a good motive as from a bad motive. 9 Ark. 485; 11 Ark. 378.

3. When Hooten presented his check and demanded the bank draft, Frayser had no discretion in the matter. Had he refused to honor the check, the bank would have been liable, if damage had resulted from the refusal. 56 Ark. 508, and cases cited; 67 Miss. 60, 6 So. 615; 3 Ruling Case Law, 177.

Frayser had no such actual knowledge of fraud as would make it his duty to pursue a course entirely different from the ordinary course of banking buisness. He would not be authorized so to act upon mere surmise, sus-

picion or conjecture. 67 Miss. 60; 27 Am. & Eng. Ann. Cases, 1342 and note; 56 Ark. 508.

Appellees were not damaged by reason of the failure to call for the treasurer's endorsement, and if they lost nothing by reason of this failure, there is no liability on the bank. 96 Ark. 379; 7 Ark. 171; 79 Ark. 160; *Id.* 266; 91 Ark. 310; 94 Ark. 26; 12 Ark. 296; 71 Ark. 305; 74 Ark. 68; 43 Ark. 454; 53 Ark. 275.

*Allen Hughes,* for appellants Hooten and Going.

1. Appellants are not liable in conversion or for receiving what they knew to be stolen property, as claimed by appellees' counsel.

The draft never passed out of the treasurer's hands and into the hands of the county or into any depository for the county, nor was it intermingled with any county funds.

The act of the county judge in counting it could not invest the county or the several road and school districts thereof with any title to the drafts. None of the plaintiffs ever acquired by these transactions any character of title to the draft that would entitle them to recover either the specific property or for the conversion thereof. 2 Cooley on Torts (3 ed.), 848, and note 85.

2. Appellants are not liable as co-conspirators to cheat and defraud the road and school districts. The alleged conspiracy, if any, is not in itself actionable. 1 Cooley on Torts (3 ed.), 210 and notes; 3 Joyce on Damages, § 2231 and note 1.

The loss to the county, the road districts and the school districts resulted from Hammett's prior defalcations, or his subsequent embezzlements, which were the proximate causes of the loss and damage sustained by the plaintiffs. Bowers on Actionable Misrepresentations, 149.

3. The court erred in including interest on the amount of the draft from July 29, 1912, as a part of the judgment against appellants. No demand had been made on them for delivery of the money. On unliquidated demands, interest is not recoverable. Sedgwick on Damages (6 ed.), 377. Treated as a judgment based on the charge

of conspiracy to cheat and defraud, or an action for deceit, interest is recoverable only from date of the judgment. 86 Ark. 600, 608.

*M. P. Huddleston, N. F. Lamb* and *Archer Wheatley,* for appellees and cross-appellants.

1. Going, Hooten and the Merchants & Planters Bank & Trust Company are liable in conversion. When the draft was returned to the bank, the title to it was in Hammett, as county treasurer. Going and Hooten had actual knowledge of this title, and the character of the endorsement imparted the same information to the bank. Moreover, Frayser had prior knowledge of the shortage, and, at the time he issued the draft, knew that it was to be used by Hammett in his settlement. Hammett had no right to endorse it to any person except for deposit to his credit as county treasurer. 29 Ark. 500-509; 102 N. E. 363; 104 N. E. 845.

A bank or other person receiving a draft endorsed as this one was, can take no more than an equitable title, and receives its subject to all defenses and to all the rights of other parties in it or its proceeds. 99 Ark. 458; 5 R. C. L., Bills & Notes, § 59, p. 536; 48 Pac. 197-201; 22 N. W. 12; 85 Fed. 120; 12 So. 512; 58 Pac. 447; 47 Conn. 417-427; 22 S. E. 127-129; 58 N. E. 1057; 56 Fed. 849-853; 11 N. W. 758; 44 Pac. 446; 77 N. W. 1083; 75 N. W. 786.

2. The above named appellants are also liable as co-conspirators to cheat and defraud the plaintiff school districts and road districts. 70 N. E. 27; 101 Ind. 293-308; 60 Atl. 74-80; 12 N. E. 865 (952), 17 N. E. 898; 2 Bishop New Crim. Law, § 190; 3 Chitty Crim. Law, §§ 1141-1143; 4 Wend. 229; 3 Greenleaf on Evidence, § 93.

3. They are also liable as the recipients of what they knew to be stolen property. The draft was made payable to Hammett individually. When he endorsed it to himself as treasurer, it became the property of the plaintiffs, and it became unlawful for Hammett or any other person to use the draft otherwise than for deposit to his account as treasurer, as provided by statute, Kirby's Dig., § 7176; article 16, section 12, Const.; Kirby's Dig., § 1842; *Id.,* §§ 6292, 6293; 82 N. C. 308; 38 Pac. 926.

4.   The Bank of Commerce of Earle, is liable for the draft issued by it to James H. Hammett.   When returned, the endorsements, erasures and forgeries appearing upon the back of the draft were of such character as to charge the bank with notice that the draft was the property of A. H. Hammett, treasurer of Cross County.   See authorities cited under division 1, *supra*.   See, also, on the question of the forgery and erasure, 28 S. E. 622; 31 Conn. 170; 122 N. W. 466; 30 S. W. 245; 6 Mo. App. 200; 70 Mo. 643; 67 Ga. 494; 39 Mo. 369; 64 N. E. 54; 99 N. W. 879; 6 Ill. 475; 106 S. W. 833; 7 Cyc. 949; 67 N. W. 845; Joyce on Defenses to Commercial Paper, § 474; 89 Atl. 639.

5.   The Massachusetts Bonding & Insurance Company is liable:   (1) Under the facts presented in this record, Ogan and Daltroff, the agents at Wynne, were general agents of the bonding company, not special agents. 48 Ark. 138-145; 103 Ark. 79; 65 S. W. 841; 10 So. 304; 41 N. E. 888; 26 Me. 84; 52 N. W. 866; 20 Pac. 771; 67 Atl. 399; 101 Pac. 564; 82 N. E. 52; 84 N. E. 540; 85 N. E. 793; 96 Ark. 456; 49 Ark. 320; 100 Ark. 360.

Apparently the agents at Wynne had authority to execute the bond after communicating with Holly Springs by 'phone, or after telling the county judge that they had done so, who had the right to presume that they had performed their duty in that respect, and in dealing with them, and through them with the company, he was not bound by any further restrictions, limitations or private instructions of which he had no information, given by the principal to its agents.   90 Ark. 301; 4 N. E. 20; 94 N. W. 510; 90 S. W. 737; 5 Atl. 504; 64 N. W. 1100; 54 N. W. 811; 92 N. W. 58; 104 N. W. 319; 10 Wall. 604, 19 L. Ed. 1008; 60 S. W. 10; 3 S. W. 486; 74 S. W. 72; 16 So. 29; 73 S. W. 881; 79 S. W. 1013; 23 So. 259; 122 Fed. 228; 135 Fed. 636; 68 S. E. 19; 21 L. R. A. 409.

II.   The bonding company ratified the act of the agents at Wynne in executing the bond.

When the principal learns that his agent has exceeded his authority, the former must act promptly if he desires to repudiate, and such repudiation must consist of notice

given to the third party. A mere wrangle between the principal and agent is not sufficient. 96 Ark. 505; 60 Mich. 150; 26 Ill. 447; 96 U. S. 640; 11 Ark. 189; 99 Ark. 358; 50 Ark. 458; 13 Fed. 74; 11 S. W. 1024; 97 Pac. 433; 47 Pac. 721; 49 Atl. 1121; 80 N. W. 48; 69 Pa. St. 426; 139 Pac. 234; 10 Ala. 755; 69 Ala. 373; 70 Ky. 334; 70 Mo. 290; 58 Tenn. 579; 43 Vt. 133; 40 Wis. 431; 51 Miss. 21.

*Hawthorne & Hawthorne,* for appellees.

1. Appellants were guilty of conversion, and the evidence clearly shows that the appellant bank entered into the conspiracy as fully and completely as either of the other defendants. Pomeroy, Equity Jur. 1048; 75 N. Y. 547; 29 L. R. A. (N. S.) 908; 18 L. R. A. (N. S.) 630; 21 Ark. 260; 31 Ark. 272.

2. On behalf of the sureties in the first and second bonds, we submit the question which set of sureties, if either, is secondarily liable for the $1,000 and the $13,-000. See 13 Mass. 208.

The sureties are not liable for interest on the money until after a proper demand was made upon them or their principal for delivery of the money. 29 L. R. A. (N. S.) 362; 55 *Id.* 381.

They are not liable upon either bond for any sum of money which was tendered to the county court on July 29, 1912. 1 L. R. A. 118, and notes.

*Bradshaw, Rhoton & Helm,* for Massachusetts Bonding & Insurance Company.

1. The authority of Ogan and Daltroff as agents was in writing and was limited to the execution of only two or three kinds of bonds and in limited amounts. Whatever authority they had was fully disclosed to the county judge. The agents at Wynne were special agents. Persons dealing with special agents must look to their authority. 17 Ark. 154; 23 Ark. 411; 74 Ark. 557; 92 Ark. 315; 81 Ark. 202; 104 Ark. 150; 105 Ark. 111; 34 Ark. 246; 41 Ark. 177; 51 Ark. 483; 62 Ark. 33; 65 Ark. 144; 105 Ark. 680; 96 Ark. 105.

2. There was no ratification of the execution of this bond. Ratification must be made with full knowledge of

the material circumstances and facts, and ignorance of such material facts will render an alleged ratification ineffectual. 64 Ark. 217; 29 Ark. 131; 11 Ark. 189.

HART, J. At the general election in September, 1908, A. H. Hammett was elected treasurer of Cross County. He duly qualified as such treasurer and executed a bond in the sum of $50,000 with F. D. Rolfe and others as his sureties. At the general election in 1910 he was again elected treasurer and executed a second bond in the sum of $65,000 with W. H. Harrell and others as his sureties. In the summer of 1912, during his second term of office, he made a settlement with the county court, and the sureties on his first and second bond were released. He then executed a new bond in the sum of $80,000, which purported to have been signed by the Massachusetts Bonding & Insurance Company as his surety. There arose a question as to whether the Massachusetts Bonding & Insurance Company had authorized its agents to sign the bond and at the same term of the county court an order was made setting aside the former order releasing the sureties on the first and second bond. Subsequently, it was ascertained that Hammett had defaulted in his office as treasurer of Cross County, and the amount of such defalcation was ascertained to be more than $21,000. The present action was instituted by the State of Arkansas for the use of Cross County against the sureties on Hammett's first and second bond, the Massachusetts Bonding & Insurance Company, J. C. Hooten, L. C. Going, the Merchants & Planters Bank & Trust Company, who, it is alleged, converted to their own use funds belonging to the county and in the custody of said treasurer to the amount, principal and interest, of something over $14,000, and against J. H. Hammett and the Bank of Commerce of Earle, Arkansas, who, it is alleged, converted to their own use funds of the county in the custody of said treasurer to the amount of $1,000 and the accrued interest.

The chancellor found that A. H. Hammett, as treasurer of Cross County, had defaulted in the sum of over $21,000, and the correctness of this finding is conceded.

The chancellor also found that L. C. Going, J. C. Hooten and the Merchants and Planters Bank & Trust Company, of Harrisburg, Arkansas, were primarily liable for the amount of money which it is alleged they converted and judgment was rendered against them for that sum.

The chancellor also found that J. H. Hammett was primarily liable for the sum of $1,000 and interest, which it is alleged he and the Bank of Commerce, of Earle, Arkansas, converted to their own use, and judgment was rendered against him for that amount, and the Bank of Commerce was discharged from any liability thereon.

The chancellor found that much the greater part of the defalcation of the treasurer occurred during the term of his first bond and judgment was rendered against the sureties on that bond in the sum of over $17,000.

Judgment was rendered against the sureties on the second bond for the defalcation which occurred during his second term of office.

The chancellor held that the Massachusetts Bonding & Insurance Company had never signed the bond for which it was sought to be held liable, and had never authorized its agents to do so. Judgment was rendered dismissing the complaint against the bonding company.

The case is here on appeal.

It is contended by counsel for Going, Hooten and the Merchants & Planters Bank & Trust Company, of Harrisburg, that they are not liable for the amount for which judgment was rendered against them.

On the question of their liability, M. H. Frayser, cashier of the bank, testified, substantially, as follows:

I have been cashier of the Merchants & Planters' Bank since November, 1906; in July, 1912, J. C. Hooten, who was then sheriff and collector of Poinsett County, was also president of the bank, and had been for about two months prior to that time; he continued as president until January, 1913; L. C. Going was at the time a director of the bank, and was its attorney; on July 26, 1912, the bank, through me as its cashier, issued a draft for $13,000 payable to the order of A. H. Hammett. The draft

was drawn upon the Mechanics-American National Bank of St. Louis, our correspondent there; Mr. Hooten gave his check on funds in the bank in his custody as collector of Poinsett County for the amount; my recollection is that his check was payable to the bank, and not to Hammett; I gave the draft to Mr. Hooten; if the draft had taken its regular course, it would have been sent to the bank on which it was drawn; the draft did not take that course, but was returned to the bank three or four days after it was drawn; the ledger shows that it was returned July 30, 1912; the draft when it was returned, was endorsed by A. H. Hammett, individually, to himself as treasurer; I knew Mr. Hammett personally and had met him and Mr. Going at Wynne some three or four weeks before this time, but did not talk about the alleged shortage of Mr. Hammett with him; Mr. Going spoke to me about the shortage a week or two before the draft was issued; Going was Mr. Hammett's attorney, and I knew from what he told me that Hammett would need some money in settling with the county court of Cross County, as treasurer.

J. C. Hooten testified: The draft in question was drawn at my solicitation, and was delivered by the cashier to me; I gave it to L. C. Going; he told me he wanted to borrow it for A. H. Hammett; I returned the draft to the bank on July 30, 1912; it was either delivered to me by Mr. Going or I received it through the mail; I knew that there was a rumor with reference to Hammett's shortage, and that there was a great deal of discussion about it; I refused to let Hammett have the money as treasurer, but agreed to let him have it as an individual; there was no understanding as to whether the draft should go through the regular course and be cashed at the St. Louis bank on which it was drawn; I was told that I would get the money back in a short time; I was at Wynne the day the settlement of Hammett was made with the county judge on July 29, 1912, and was in the courthouse a part of the time while the settlement was being made; neither Mr. Hammett nor Mr. Going gave me any written memoranda that the money had been borrowed; I trusted to Mr. Going's word that it would be returned; after the

settlement was made in the courthouse at Wynne, Going and I got in an automobile and came back to Harrisburg; we came by Mr. Hammett's house, and Going went in and talked to him a few minutes; I knew that the draft enabled Mr. Hammett to make his settlement with the county court because I heard them talking about it during the settlement.

The draft was introduced in evidence and, with the endorsements, is as follows:

"MERCHANTS AND PLANTERS BANK & TRUST COMPANY.

"Merchants & Planters Bank.                    No. 7912.

"Harrisburg, Arkansas, July 26, 1912.

"Pay to the order of A. H. Hammett $13,000 (thirteen thousand) dollars, in current funds.  M. H. Frayser, Cashier.

"To Mechanics-American National Bank, St. Louis, Mo.

(Endorsed.)  "Pay to the order of A. H. Hammett, treasurer of Cross County, Arkansas."  (Signed) A. H. Hammett.  Pay to the order of J. C. Hooten (then comes a space, beneath which is written "Treasurer of Cross County, Arkansas.")

L. C. Going testified as follows:  I was Hammett's attorney and think the draft in question was returned by mail to Mr. Hooten by Mr. Hammett; I am sure I did not receive it from Hammett; Mr. Hooten delivered the draft to me at Wynne and the draft was used in making the settlement of Hammett, as treasurer, with the county court of Cross County; I had learned that $13,000 would be required by Mr. Hammett to make his settlement as treasurer, and arranged to get the money for that purpose; the draft was payable to A. H. Hammett, individually, and he was required by the county court to endorse the draft to himself as treasurer.

(1-2)  Under this state of facts it can not be doubted that the draft was converted by Going and Hooten.  "Any distinct act of dominion wrongfully exerted over one's property in denial of his right or inconsistent with it, is a conversion."  Cooley on Torts (3 ed.), vol. 2, p. 859.

"Anything which is the subject of property, and is of a personal nature, is the subject of conversion." *Id.* 856.

(3)  From the above testimony it appears that Going procured Hooten to arrange to get $13,000 for Hammett to use in his settlement as treasurer with the county court.  Hooten procured the cashier of the bank to issue a draft upon a bank in St. Louis for the sum of $13,-000, payable to A. H. Hammett, individually.  This draft was delivered to Going for the purpose of being delivered to Hammett to be used in his settlement.  When the draft was delivered to Hammett it became his individual property and represented that much money.  The county court would not accept a draft payable to Hammett individually in his settlement as treasurer of the county; Hammett then endorsed the draft to himself as treasurer of the county, and the county judge accepted the draft in settlement.  By this endorsement, Hammett transferred the funds from himself as an individual to himself as treasurer of the county.  As such treasurer, he was custodian of the funds of the county and the money represented by the draft thereafter belonged to the county.  Neither Hammett, Hooten or Going had any right to it.  When they returned the draft to the bank at Harrisburg without collecting it and placing it to the credit of Cross County, they converted the money represented by the draft to their own use and became liable for it to the State for the use of the county.

(4)  It is contended, however, that the bank at Harrisburg is not liable.  We think it is liable for two reasons: in the first place, the cashier of the bank knew that Hammett was reported to be short in his accounts as treasurer of the county and that the draft was procured to be used in his settlement with the county court.  The cashier of the bank is its chief executive officer, through whom its financial operations are conducted, and by whom its debts are received and paid and its securities taken and transferred.  By virtue of his office, he is generally entrusted with the bank's funds and securities, and charged with the duty of superintending its books, pay-

ments and receipts as a moneyed institution. Mitchie on Banks and Banking, vol. 1, section 54; Id., section 102; 3 R. C. L., section 71, page 444.

It follows that the knowledge of the cashier was the knowledge of the bank. The cashier knew that the funds were loaned that Hammett might make his settlement as treasurer of Cross County with the county court, and thereby make good a shortage in his account. The bank, therefore, knew that the money represented by the draft was to become the property of Cross County, and that thereafter Hammett would have no title to the money, and would only be entitled to hold it as custodian for the county by virtue of his office as treasurer.

Hence, we are of the opinion that under the facts in this case, the bank was also liable for the conversion of the draft. In addition to this it will be noted that the county court required Hammett to endorse the draft and make it payable to himself as treasurer of Cross County. When the draft was delivered back to Hooten, it was not again endorsed by Hammett. It was endorsed by Hooten as treasurer of Cross County. Hooten was not treasurer of Cross County, but was sheriff and collector of Poinsett County. It was evidently the intention to have Hammett endorse the check back as treasurer of Cross County, but he did not do so, and the draft was returned to Hooten unendorsed by him.

(5) It is well settled that the purchaser of a check who obtains title without the endorsement by the payee holds it subject to all equities and defenses existing between the original parties, even though he has paid full consideration without notice of the existence of such equities and defenses. 5 R. C. L., par. 59, p. 536.

(6) The draft, by the endorsement of Hammett as an individual to himself as treasurer of the county, became the property of the county. It was not thereafter endorsed by Hammett either individually or as treasurer of the county, and when the check was returned to the bank at Harrisburg in this condition, the bank was charged with knowledge that the draft was the property of Cross County because that fact was apparent from the

face of the draft, and the endorsements thereon. *Webster v. Carter,* 99 Ark. 458. *Quincy Mutual Fire Ins. Co.* v. *International Trust Co.* (Mass.) 104 N. E. 845; *Franklin Savings Bank* v. *International Trust Co.* (Mass.), 102 N. E. 363.

(7) It will be noted that the draft was returned to the bank at Harrisburg on July 30, 1912, and was thereafter claimed to be the property of the bank. The chancellor charged the bank, Hooten and Going with interest at the rate of 6 per cent per annum from that date, and it is urged by their counsel that this was error. The reason given is that on unliquidated demands interest is not recoverable. A sufficient answer to that argument is to say that the amount recovered was not an unliquidated demand. It was definite and certain. Besides that, this court has uniformly held that interest may be added on property converted from the date of the conversion.

It is next contended by counsel for the State that the Bank of Commerce, of Earle, Arkansas, is liable for the $1,000 draft issued by it to James H. Hammett on July 26, 1912, and in this contention we think counsel are correct. The draft as issued was payable to A. H. Hammett or order. He endorsed it, "Pay to the order of A. H. Hammett, treasurer of Cross County, Arkansas. (Signed) A. H. Hammett." No other endorsement appears on it. When the draft was returned to the bank on August 5, the letter "J" had been written over the letter "A" in the name of A. H. Hammett, preceding the words, "treasurer of Cross County, Arkansas." The alteration is shown to be clearly apparent. Following the name A. H. Hammett, the words "treasurer of Cross County" had been erased. The original words, however, are shown to be clearly discernible and were so to the cashier and bookkeeper of the bank when the draft was presented to them while on the witness stand.

Under the authorities which we have already cited, the bank was charged with notice of these alterations, and if inquiry had been made, the information that the draft had already become the property of Cross County would have been obtained. Therefore, the bank took it, upon

its return, subject to the rights of Cross County. In short, the erasures and interlineations on the endorsement showed that the check had been transferred to the treasurer of Cross County, and had thereby become the property of the county.

For this reason the bank is liable and the chancellor erred in rendering judgment in its favor.

(8) It is also contended by counsel for the State that the Massachusetts Bonding & Insurance Company is liable on the bond purported to have been executed by it. In this contention we think counsel are in error. It appears from the record that the company had a local agent and a local attorney in the town of Wynne, and that application was made to them to execute a bond as surety for Hammett as treasurer of Cross County. Hammett had been required by the county court to execute a new bond and fifteen days had been given him within which to execute it. On the last day he approached the local agents of the bonding company at Wynne for the purpose of procuring the company to sign his bond as surety. The local agents informed him that they had no authority to execute certain bonds of a designated amount, and that they had no authority whatever to execute the bond in question for their company. They testified, however, that they called up the general agent of the company in Mississippi, and that he told them to execute the bond and send it for their approval. The general agent of the company in Mississippi testified that he did not talk with them on the occasion in question, and that he was at that time away on his vacation, and not in the town where his office was located.

In this he is corroborated by the chief clerk in his office, who stated that he was the person who talked with the local agents at Wynne, and said that he distinctly told them that they had no authority to sign the bond in question, that his office had no such authority, and that the bond would have to be sent on to the home office for its signature.

The general agent also testified that he had no authority to issue the bond in question, and that the clerk in

his office was only given authority to sign his name to such papers as he himself had power to sign. It was shown that the county judge had knowledge of the limitation of the authority of the agents before he approved the bond.

The chancellor found that the agents had no authority either real or apparent to execute the bond, and we think his finding is not against the preponderance of the evidence.

(9)   Again it is contended that the bonding company ratified the execution of the bond, but we think it is apparent from the record that it did not do so.   Sometime after the bond was executed and approved by the county court it came to the knowledge of the company that it was reported to have executed such a bond, and it took immediate steps to repudiate any such action on its part and disclaimed any authority on the part of its agents to execute such a bond.   It communicated at once with its general agent in Mississippi, who was thought to have directed the execution of the bond, and he at once repudiated any knowledge that it had been executed.   These facts were at once communicated to the county court of Cross County.

Under these circumstances we do not think the bonding company can be said to have ratified the action of its agent in executing the bond, and are of the opinion that the chancellor was correct in holding that the bonding company was not liable.

It appears from the record that all the defalcations for which the chancellor held the sureties on the first bond occurred during Hammett's first term in office, and for that reason the chancellor correctly held the sureties on that bond liable.

It appears also that a certain part of the defalcation occurred during Hammett's second term in office and the chancellor correctly held the sureties on that bond liable therefor.

The record in the case is voluminous, and we have not attempted to set out the testimony which was before the chancellor in detail.   We believe, however, that we have set out the substance of the testimony applicable to

the issues raised by the appeal. We have examined and considered the whole record carefully, and have reached the conclusion that the decision of the chancellor was correct except as to the liability of the Bank of Commerce of Earle, as indicated in the opinion. The decree of the chancellor will, therefore, be affirmed except in that regard, and that part of the decree will be reversed and judgment will be entered here in favor of the State for the use of Cross County against the Bank of Commerce of Earle, Arkansas, for the sum of $1,000, with interest thereon at the rate of 6 per cent from August 5, 1912, the date on which the draft was returned to the bank and converted by it to its own use.