## MEMBERS MUTUAL INSURANCE COMPANY
### *v.* THOMAS BLISSETT

5-6186                                    492 S.W. 2d 429

Opinion delivered April 9, 1973

*Barber, Henry, Thurman, McCaskill & Amsler,* for appellant.

*Brown, Compton & Prewett,* for appellee.

J. FRED JONES, Justice. This is an appeal by Members Mutual Insurance Company, hereinafter called Mutual, from a circuit court judgment rendered on a jury verdict in favor of Thoṇ ᴉs Blissett in a suit brought by Blissett to recover the excess of a judgment rendered against him

in a suit for personal injuries instituted by Mr. and Mrs. Frisby.

The background facts are these: Mr. and Mrs. Frisby brought suit against Mr. Blissett for personal injuries growing out of an automobile collision and obtained a judgment on a jury verdict against Blissett in the amount of $21,418 and the judgment was affirmed on appeal to this court. *Blissett* v. *Frisby*, 249 Ark. 235, 458 S.W. 2d 735. Blissett carried his liability insurance with Mutual under a policy with $10,000 limit for each person. Under the terms of the policy Mutual agreed to defend any suit against the insured alleging bodily injury or property damage and seeking damages payable under the terms of the policy. Among other things the policy provided as follows:

". . . the company may make such investigation and settlement of any claim or suit as it deems expedient.

\* \* \*

The insured shall cooperate with the company and upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of bodily injury, property damage or loss with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of accident."

Mr. Blissett filed the present suit against Mutual alleging that he was sued for $40,350 by the Frisbys; that Mutual furnished and paid for a defense to that lawsuit but that during the pendency of the lawsuit and prior to the trial thereof, the Frisbys made frequent demands for a settlement of their claims for sums less than the limits

under Mutual's policy, but that Mutual's highest offer in settlement was the sum of $4,000 which was so meager as to constitute bad faith and negligence on the part of Mutual. Mr. Blissett prayed damages in the amount of $21,-776 together with 12% penalty, reasonable attorney's fee and 6% interest from December 16, 1969, until paid.

In Mutual's answer it denied that it was guilty of negligence or bad faith in its negotiations for a settlement with the Frisbys. A jury trial resulted in a judgment for Mr. Blissett in the amount of $11,418 still owed on the Frisby judgment together with all interest accumulated thereon, said amounts to be paid into the registry of the court for the satisfaction of the judgment in favor of the Frisbys against Blissett. The policy limits of $10,000 had already been paid by Mutual.

On appeal to this court Mutual contends that its motion for directed verdict should have been granted by the trial court and that the trial court erred in ordering the payment of interest on the Frisby-Blissett judgment accruing prior to the entry of judgment in the case at bar.

In the argument in support of its contention that the court erred in not directing a verdict in its favor, Mutual narrows the issues to two points stated as follows:

"First we submit that the law in this State is that if the insurance company is to be held liable for a negligent failure to settle, there must have been a demand by the insured that the company settle the case within the policy limits.

Secondly, . . . there was no evidence submitted on which it could be concluded that the defendant was guilty in failing to settle."

In support of its contention that a demand must be made by the insured before liability attaches for failure to settle, the appellant cites *Southern Farm Bureau* v. *Parker*, 232 Ark. 841, 341 S.W. 2d 36, and argues that even though the necessity of a demand was not discussed in the opinion in that case, that we should now declare such to be the law. The *Parker* case was decided in 1960. In *State Farm Mu-*

*tual Automobile Ins. Co.* v. *Jackson,* 346 F. 2d 484 (1965), the Eighth Circuit Court of Appeals stated:

> "As to the matter of a demand to settle: Although the Arkansas court in Southern Farm Bureau Insurance Company v. Parker, supra, approved a set of instructions, including, inter alia, one requiring a demand for settlement by the insured, that specific point was not discussed or specifically ruled by the Court in that case. No case has been cited, and we find none, in which the Arkansas Supreme Court has affirmatively decided the above question."

The Eighth Circuit Court of Appeals affirmed the District Court in holding that a demand to compromise was not necessary to liability and it was pointed out in the *Jackson* decision that under the terms of the policy contract the company was given the power to determine whether an offer of compromise should be accepted or rejected within its coverage limits.

We do not deem it advisable to lay down a strict rule of law in this case that would require the insured to make demands upon the company that the claim be settled within the policy limits regardless of the provisions of the agreed contract. As already pointed out, in the case at bar, Mutual reserved the right to make such investigation and settlement of any claim or suit as it deemed expedient and the contract provided that the insured "shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than such immediate medical or surgical relief to others as shall be imperative at the time of the accident." As a matter of fact, the policy contract provides that "the insured shall cooperate with the company and upon the *company's request,* assist in making settlement. . ." (Emphasis added). There is no suggestion in the case at bar that Mr. Blissett, the insured, failed to co-operate with Mutual.

We now come to the question of whether there was sufficient evidence of negligence on the part of Mutual to take the case to the jury and we con-

clude that there was. In *Hoffman Wholesale Supply Co.* v. *Terry*, 240 Ark. 399, 399 S.W. 2d 658, in dealing with a directed verdict, we said:

"... this court has said on numerous occasions that, in determining the correctness of the trial court's action in directing a verdict for either party, we must take that view of the evidence which is most favorable to the party against whom the verdict is directed, and, *if there is any substantial evidence* tending to establish an issue in favor of the party against whom the verdict is directed, it is error for the court to take the case from the jury. See *Barrentine* v. *The Henry Wrape Company*, 120 Ark. 206, 179 S.W. 328, and cases cited therein. Also, in *Smith* v. *McEachin*, 186 Ark. 1132, 57 S.W. 2d 1043, we said:

'... In testing whether or not there is any substantial evidence in a given case, the evidence and all reasonable inferences deducible therefrom should be viewed in the light most favorable to the party against whom the verdict is directed, and, if there is any conflict in the evidence, or where the evidence is not in dispute but is in such a state that fair-minded men might draw different conclusions therefrom, it is error to direct a verdict.'"

See aslo *Home Mut. Fire Ins. Co.* v. *Cartmell*, 245 Ark. 45, 430 S.W. 2d 849.

It is clear, therefore, in the case at bar that the trial court did not err in refusing to direct a verdict in favor of Mutual if there was evidence upon which fair-minded men might draw different conclusions therefrom. It is well established in this state than an insuror is liable to its insured for any judgment in excess of the insured's policy limits if the insuror's failure to settle the claim was due to fraud, bad faith or negligence. *Tri-State Ins. Co.* v. *Busby*, 251 Ark. 568, 473 S.W. 2d 893.

We now examine the evidence in the light of the above rules. The facts surrounding the collision out of which the original lawsuit arose are set out in *Blissett* v.

*Frisby, supra.* There was the usual conflict in that evidence; Mrs. Frisby contending that she had gradually slowed her automobile and was in the process of driving it to the shoulder of the highway when she was suddenly struck from the rear by the Blissett automobile. Mr. Blissett testified that he observed Mrs. Frisby having difficulty with her small child in the seat with her and he contended that she suddenly stopped her automobile in the highway ahead of him and he could not avoid striking her automobile.

Mrs. Frisby underwent thoracic surgery after several months medical treatment as a result of injuries she sustained in the collision and the sufficiency of the evidence to sustain the amount of the judgment for her injuries is not questioned. We now consider the evidence as it relates to Mutual's alleged negligence in its failure to settle the Frisby claim against Blissett within the policy limits.

Mr. John M. Shackleford, Jr., an attorney in El Dorado, represented Mr. and Mrs. Frisby in their suit against Mr. Blissett and he testified at length as to the efforts made to settle the Frisby claim. The substance of his testimony was to the effect that both prior and subsequent to his employment, the Frisbys offered to settle for $5,000 and Mutual offered $3,000. He said that after the issues were joined in litigation with attorney Richard H. Mays representing Mutual and Mr. Blissett, a first trial of the case resulted in a mistrial because of the jury being unable to agree on a verdict. He said that it was established by evidence at the trial of the case that Mrs. Frisby had sustained medical and related special damages of $4,408.39 and a 10% to 20% permanent partial disability because of the injuries. He said he still offered, on behalf of the Frisbys, to settle their claim for $8,500 together with $200 property damage and the costs, and that Mutual did finally offer an additional $1,500 on the medical, making a total of $4,500 as its best and final offer. Mr. Shackleford testified that after the judgment was entered in this case, in recognition of Mr. Blissett's limited assets, he offered to settle the judgment for substantially less than the amount of it but to no avail. He said that after the judgment was affirmed by this court, Mutual

paid the $10,000 limits of their coverage and also paid $350 property damage together with accumulated interest.

Mrs. Evon Blissett testified that she was a passenger in her husband's automobile; that she gave her deposition but did not testify at either trial. She said she did not have any contract with any representative of Mutual before suit was filed but did talk with attorney Mays after suit was filed. She said that she does not remember the exact amount the Frisbys were asking in settlement but it seemed to her at the time that it was a rather small amount. She said that prior to the first trial when she and her husband were in Mr. Mays' office, and her husband inquired as to why Mutual did not settle the Frisby claim, Mr. Mays replied: "They're just being stubborn."

Mr. Blissett's testimony was about the same as that of Mrs. Blissett. He said that when the accident occurred, he reported it to Mutual's Dallas office; that the Dallas office referred him to an adjuster in Texarkana who in turn referred him to the Ed Morneau's Claims Service in Hope, Arkansas. He said he was subsequently contacted by an adjuster from that firm. He said he did not consider the collision in any way his fault, but that no one discussed the matter with him from the time he discussed it with the adjuster immediately following the collision until about a year later when he was served with summons. He said that during the preparation for one of the trials, he asked Mr. Mays whether the Frisbys had offered to settle and was advised that they had. He said that he then inquired as to why the matter had not been settled and that Mr. Mays replied: "Well, they wouldn't. They were being stubborn and wouldn't settle." He said he did not know whether there was any offer after that or not. He said he didn't inquire any further into the matter because he knew nothing about procedure of that nature and didn't know whether his insurance company should settle or not settle; that he left the matter entirely up to Mr. Mays to handle.

Mr. Vernon T. Winchester, assistant claims manager for Mutual, testified that he is sure that he reviewed the file in this case after the Morneau firm had finished its investigation. He said that he did not feel that Mr. Blissett was at fault. He said that he selected attorney Mays

to defend the lawsuit and sent him the copy of complaint and the investigation file. He said that he received a letter from Mr. Mays advising that depositions had been taken and recommending a figure of not in excess of $5,500 as a top offer in settlement. He said that he acts on the advice of Mutual's attorney, and upon receipt of Mr. Mays' letter he raised the reserves on the claim from $3,100 to $6,100 on the personal injuries in addition to the reserve for medical subrogation and property damage. Mr. Winchester testified, "I do not reserve in excess of what I think a case is possibly worth." He said that after he learned that Farm Bureau was also being represented on its subrogation claim by Mr. Shackleford, he extended settlement authorization to Mr. Mays in the total amount of $4,500 and that Mr. Mays never did make other recommendations above the $5,500 figure. He said that after the judgment totaling over $21,000 was rendered at the second trial and before appeal to this court, Mutual was willing to pay the $10,000 limit plus property damage if it could wipe the whole thing out and "get Mr. Blissett off the hook."

On cross-examination Mr. Winchester testified that he never did tell Mr. Mays to offer as much as the $5,500 recommended by Mr. Mays. He said that after the first trial resulting in a hung jury and prior to the second trial, he did not increase the authority by calling Mr. Mays and saying, "Richard, offer so much." He said that he did ask Mr. Mays to delve into the possibility of negotiation. He testified that he had no recall of increasing the authorization to Mr. Mays between the two trials. He testified that he changed the reserves on this case from $3,100 to $6,100 for bodily injuries and a separate reserve for property damage and said he would have authorized the payment of $6,100 for the bodily injuries because he did not reserve more than the maximum amount he thinks a claim is worth. He said that he could not tell from his files whether Mr. Mays ever knew that Mutual would be willing to pay $6,100 in settlement of the claim. He said he never did give Mr. Mays authority to settle the claim for $6,100, but did ask Mr. Mays to delve into the possibility of negotiating the claim after he had authorized $4,500 and after demand was made for $8,500 plus property damage. He testified that the maximum authority reflected in his files was $4,500, and he never did

extend any further written authority to Mr. Mays to settle the case.

Mr. Mays testified that Mutual sent the file to him and advised that it was advising the Blissetts that he had been retained to represent their interest in the case and that they should communicate with him, which they did. He said that he had several conversations with the Blissetts and discussed the fact that they were being sued for more than the policy limits. He said that after going over the matter he suggested to Mutual a settlement figure not to exceed $5,500. He said that in making this suggestion he took into consideration the extent of injuries on what he considered to be a questionable case of liability, and that because of what he considered to be comparative negligence on the part of Mrs. Frisby, he felt there was a reasonable possibility of a defendant's verdict. He testified that he does not recall the Blissetts inquiring as to why the case was not being settled. He said he was under the impression that the Blissetts were hoping that the case could be settled as a matter of convenience, but that he does not recall ever stating to them that Mutual was being stubborn. He testified that after Mr. Shackleford got into the case the offer he made on behalf of the Frisbys was $8,500, which included the medical expenses but that they wanted in addition $250 to $350 property damage and court costs including costs of depositions. He said that he felt that if the Frisbys were willing to come off the $8,500 plus offer, he would be willing to go back to Mutual and see if it would be willing to increase the authority it had given him. He said he believed he had a telephone conversation with Mr. Winchester prior to the first trial and he believes, as the trial was nearing, Mr. Winchester authorized him to make an offer of $4,500. He said, as he recalls, Mr. Winchester advised him to see if the offer of $4,500 would be accepted and, if it was not accepted, maybe they could find out what they would come down to. He said that he obtained the impression, however, from Mr. Winchester, that if the case could be settled for $5,000 or $6,000 that Mr. Winchester would have considered authorizing a settlement in that neighborhood. He said that he evaluated the case and in his opinion it was worth $5,500 to $6,000 in settlement value, but that Mr. Winchester never did give him authority to go to

$6,000. He said that Mr. Winchester did tell him in a telephone conversation to offer $4,500 and if that was refused, and the Frisbys made a counter offer, to call him back and he would see what could be done. He said that he was never given settlement authority in excess of $4,500 and he never made request for authority above that amount, except for his original evaluation.

In Mr. Mays' letter of January 15, 1969, to Mr. Winchester, he reported that depositions were taken in the case on January 13 and that Mrs. Frisby made a most impressive witness in her own behalf. He advised that she was an attractive and articulate woman who had not exaggerated her injuries but at the same time had not played them down, and he stated:

> "Frankly, I was quite impressed with her bearing as a witness and I am afraid she is going to hurt us considerably if the jury finds against us on the issue of negligence.

> Your insured, Mr. and Mrs. Blissett, made adequate witnesses although unfortunately they seem to have seen the accident in different ways. However, the inconsistencies in their testimony are not substantial or particularly material."

Mr. Mays then pointed out in his letter the conflict in the testimony as to how the accident occurred and also advised as to the law on comparative negligence in Arkansas, and then stated:

> "However, the jury makes this comparison and reduces the damages, and on a general verdict, we do not know what the jury thought about the comparative negligence of the plaintiff or whether they took this into consideration in affixing the plaintiff's judgment."

He then explained to Mr. Winchester the trial court's reluctance to submit a case on interrogatories as to the degrees of negligence where there are only two parties involved. He then stated:

"In my opinion, the case is one which would be worthy of settlement if it can be done so for a reasonable figure. The plaintiff has offered to settle the case for the sum of $8,500.00 plus $200.00 property damage plus Court costs (including the expenses of the depositions). The plaintiffs apparently have approximately $1,500.00 of direct medical expense, plus an additional $1,500.00 of caretaking expense, transportation expense to doctors, etc. * * * The $8,500.00 figure mentioned above includes these medical expenses.

It is my opinion that the plaintiffs will be agreeable to reducing this offer somewhat and in my opinion we should come up somewhat from the previous offers which have been made. It is my understanding that the highest previous offer of settlement by your company was $4,000.00. This is going to be an expensive suit for both parties to try, due to the number of physicians who are involved, most of whom are not local physicians. Therefore, I would suggest a figure not to exceed $5,500.00 as our top settlement offer.

As soon as I have received the transcripts of the depositions and other medical information, I shall forward them on to you.

I would appreciate having your thoughts on this matter at your earliest opportunity."

Summarizing the evidence of negligence in this case, Mutual reserved in its contract with Mr. Blissett, the right to investigate and settle claims made against him, and Mr. Blissett was only authorized under the contract to assist in making settlements when requested to do so by Mutual. Before attorneys were employed and suit was filed, the Frisbys asked $5,000 and Mutual offered $3,000. After attorneys were employed and suit was filed, the Frisbys, through their attorney, asked $8,500 and Mutual, through its attorney, offered $4,500. Mutual, through its Dallas home office claims supervisor, carefully selected a competent local trial attorney to represent it and its insured. He made investigation and reported in detail his

impression of witnesses on both sides and evaluated the impression they would probably make on a jury and he recommended to Mutual a top settlement figure of $5,500. Instead of authorizing its attorney to offer that amount, or to use his own judgment in the light of his experience and the local situation, Mutual simply increased its reserves to what its claims supervisor considered the case was probably worth but only authorized its attorney to offer a total amount of $4,500.

We are of the opinion that the settlement authority Mutual reserved to itself under its contract with Blissett estopped it from relying on a demand from Blissett that the claim against him be settled within the policy limits, and we are also of the opinion there was enough evidence of negligence on the part of Mutual to take the case to the jury on the question of whether Mutual was negligent in not settling the claim within policy limits.

We hold that the trial court did not err in refusing to direct a verdict for Mutual, but we are of the opinion that the trial court did err in awarding judgment for accumulated interest on the Frisby judgment against Blissett. The substance of our holding on this point in *Southern Farm Bureau Cas. Ins. Co.* v. *Hardin,* 233 Ark. 1011, 351 S.W. 2d 153, and *Tri-State Ins. Co.* v. *Busby, supra,* is that a suit by an insured against his liability insurance carrier for negligent failure to settle a claim or lawsuit within policy limits, is a separate tort action and a judgment thereon only bears its own interest from the date of its rendition. With this modification the judgment is affirmed.

Affirmed as modified.

BROWN and FOGLEMAN, JJ., dissent as to the affirmance.

BYRD, J., dissents to the modification.

HOLT, J., not participating.

JOHN A. FOGLEMAN, Justice, dissenting. I cannot bring myself to a concurrence in the action of the court in this case. This court has clearly recognized, at least since *Home Indemnity Company* v. *Snowden,* 223 Ark. 64,

264 S.W. 2d 642,[1] that a liability insurance company, which has virtually absolute control of settlement of a claim against its insured, at least when a settlement can be made by a payment within the policy limits, owes a duty to the policyholder to act in good faith and without negligence. I cannot subscribe to the unsound theory that an insurer should be liable for errors in judgment or want of the clairvoyance necessary to predict the amount of a jury verdict, especially where the question of liability is close and negligence must be compared. I think appellant is being penalized either for its failure to exercise good judgment, measured on the scale of hindsight, or its lack of intuitive ability to foresee, not only the result of the jury's comparison of negligence, but, the amount which it would award as damages, particularly when a substantial part must have included awards for pain, suffering and mental anguish, present and future, and other elements of damage (such as loss of ability to earn and the husband's loss of services and consortium) for which no one has discovered an adequate gauge other than the collective judgment of whoever might be the jurors in a particular case. See *Blissett* v. *Frisby*, 249 Ark. 235, 458 S.W. 2d 735. And this follows the court's recent rejection of the idea that poor judgment can be equated with negligence. *Tri-State Insurance Company* v. *Busby*, 251 Ark. 568, 473 S.W. 2d 893. Infallibility in predicting the result of a case such as this should not be expected. The great possibility of an error in judgment, when so many intangible and imponderable factors are involved is well illustrated by the fact that the first trial in this case resulted in a hung jury by a vote which both Shackleford and Mays thought was 6 to 6. Shackleford's testimony in explaining the prayer for damages in the complaint he filed for the Frisbys emphasized the uncertainty in predicting a jury verdict.

In my opinion, the correct rule as to these matters was followed by the United States Court of Appeals for the Fourth Circuit in *American Casualty Co. of Reading, Pa.* v. *Howard*, 187 F. 2d 322 (1951). That case bears a striking similarity to this, but the evidence is even strong-

---

[1] It is interesting to recall that the court limited recovery in this case to the policy limits.

er there because a demand for settlement was made by the insured, and the action for wrongful death was covered by a $5,000 policy. In reversing a judgment against the insurance company and dismissing the case, that court said:

> Lawyers representing liability insurers of motor users are not required to be prophets who can accurately foretell the results of litigation in personal injury cases arising out of automobile accidents, nor does a mere mistake of judgment by these lawyers impose liability on these insurers beyond the policy limits of coverage. If these lawyers act reasonably, in good faith and without negligence in refusing proffered settlements, they, and the insurers they represent, have fully lived up to the duties imposed upon them. See, Bedford v. Armory Wholesale Grocery Co., 195 S.C. 150, 10 S.E. 2d 330; Lynch v. Pee Dee Express, 204 S.C. 537, 30 S.E. 2d 449; Farmers Gin Co. v. St. Paul Mercury Indemnity Co., 186 Miss. 747, 191 So. 415; Burnham v. Commercial Casualty Insurance Co., 10 Wash. 2d 624, 117 P. 2d 644.

The burden was upon appellee to show that appellant's conduct in the matter was not the result of its failure to use good judgment but was the result of its negligence.[2] In order that the question of the legal sufficiency of the evidence to meet this burden may be viewed in proper perspective, I must call attention to certain factors which I consider of some significance, but which are given little attention by the majority.

The first negotiations were conducted with an *independent* adjusting company acting on behalf of appellant. That company evaluated the claim at $3,000, and the report of its investigation was made to appellant. From this report, appellant's assistant claims manager formed his opinion that Blissett was not at fault. Mays, the attorney employed by appellant to defend the Frisby suit, and upon whose advice appellant relied, never valued the claim, for settlement purposes, at more than $5,500. Not

---

[2]There was no evidence of fraud or bad faith. The first was not alleged. The trial court properly eliminated the latter as an issue.

only did Blissett not demand settlement upon the basis of the offer made by Shackleford as attorney for the Frisbys, he did not even request or suggest that a settlement be made at this or any other figure. Blissett adamantly maintained that he was not at fault, even when he testified in this case. The greatest concession he ever made was his statement in that testimony that he could not have been any more at fault than Mrs. Frisby. Shackleford testified as to Mays' great faith in Blissett's defense. Blissett was advised, not only of the various steps taken but, of his right to employ his own attorney to protect his rights in view of the policy limits, but he chose not to avail himself of this right.

All negotiations after the filing of the Frisby suit were conducted between Shackleford and Mays. At one time, Mays asked Shackleford if the Frisbys would consider an amount less than their demand and was told that a lesser offer would be communicated to the Frisbys without Shackleford's favorable recommendation unless the amount was somewhere near the demand. Shackleford indicated, in retrospective testimony, that he would have recommended a settlement for a total of approximately $8,000, but admitted that he never made an offer to settle for less than $8,700 plus costs. He recalled that Mays expressed the thought that a settlement might be reached. He would not deny that Mays inquired about a settlement in the range of $5,000 to $6,000 although he could not recall it. Mays testified that this inquiry was made at the request of Winchester, appellant's assistant claims manager, and Shackleford indicated that if the company would offer no more than this, they might as well get ready to try the lawsuit. Shackleford testified that he had the definite impression that Mays' suggestion of a $5,000 to $6,000 figure was on a "take-it-or-leave-it" basis, even if appellant would authorize it. Winchester confirmed the fact that he had requested that Mays ascertain from discussions with Shackleford whether there was room for further negotiations.

Mays was always of the opinion that the Frisby offer was in excess of a reasonable settlement value, and that total damages would not amount to more than the

policy limits, even if the jury should find no negligence attributable to Mrs. Frisby. He doubted liability for certain out-of-pocket expenses[3] and felt that Mrs. Frisby's disability was not as substantial as claimed. He felt that the insured's liability was highly questionable and that there was a reasonable possibility of a defendant's verdict.

On the basis of the evidence, giving it the very highest probative value possible, I have been unable to see how there was anything more than a mistake in judgment on the part of the insurance company and its attorney. This brings me to a bit of testimony which appellee and the majority opinion emphasize. That is the testimony of the Blissetts that Mays responded to their question why the insurance company did not settle the claim by saying that "they were being stubborn." Although there may be some question as to who he thought was being stubborn, the inference to be drawn from this testimony most favorable to appellee is that he referred to the insurance company. I do not consider this to be substantial evidence even though it was admitted without objection. I think that it is not substantial evidence because it has no probative value.

In the first place, this statement by the attorney was not binding on the client. An extrajudicial statement or admission by an attorney (made in the absence of the client and without his knowledge or consent) which is not given for the purpose of dispensing with proof of the fact admitted, is not binding on the client unless the attorney has special authority to make it, aside from his mere employment in connection with pending or prospective litigation. 7 Am. Jur. 2d 121, § 122; *Hogenson v. Service Armament Co.*, 77 Wash. 2d 209, 461 P. 2d 311 (1969). See also, *Geesey v. Albee Pennsylvania Homes, Inc.*, 211 Pa. Super. 215, 235 A. 2d 176 (1968). Such admissions are not evidence. *Hicks v. Naomi Falls Mfg. Co.*, 138 N.C. 319, 50 S.E. 703 (1905). Furthermore, such a statement will not be binding if it is not a statement of fact but a mere expression of an opinion. *Cato v. Silling*, 137 W. Va. 694, 73 S.E. 2d 731, cert. denied, 348 U.S. 981,

[3]See *Blissett v. Frisby*, 249 Ark. 235, 458 S.W. 2d 735.

75 S. Ct. 572, 99 L. Ed. 764 (1952), reh. denied, 349 U.S. 924, 75 S. Ct. 659, 99 L. Ed. 1256 (1952); *State* v. *Edins,* 25 N. M. 680, 187 P. 545, 8 A.L.R. 1331 (1920); *Hicks* v. *Naomi Falls Mfg. Co.,* supra. We have held that the mere statement of a witness' conclusions without his detailing facts which would furnish a logical basis for his belief is not competent evidence to sustain a judgment. *Couch* v. *Rockafellow,* 205 Ark. 1153, 172 S.W. 2d 920. The statement of a mere conclusion has no probative force. *United States* v. *Nelson,* 102 F. 2d 515 (8th Cir. 1939), cert. denied, 308 U.S. 550, 60 S. Ct. 81, 84 L. Ed. 462 (1939).

Testimony of no probative value does not constitute substantial evidence. Substantial evidence means that which has probative force on the issues and is of legal significance. *Tangora* v. *Matanky,* 231 Cal. App. 2d 468, 42 Cal. Rptr. 348 (1964). Substantial evidentiary support requires evidence having a rational probative force. *Consolidated Edison Co.* v. *L. R.,* 305 U. S. 197, 59 S. Ct. 206, 83 L. Ed. 126 (1938). In determining the legal sufficiency of the evidence to support a verdict (or to justify denial of a directed verdict) the question for the appellate court is whether the testimony, given its strongest probative force, is of a substantial character. *St. Paul Fire & Marine Ins. Co.* v. *Martin,* 204 Ark. XVIII, 165 S.W. 2d 606; *Coca-Cola Bottling Co.* v. *Spurlin,* 199 Ark. 126, 132 S.W. 2d 828; *Western Union Telegraph Co.* v. *Byrd,* 197 Ark. 152, 122 S.W. 2d 569; *Hall* v. *Jones,* 129 Ark. 18, 195 S.W. 399; *Cleveland-McLeod Lumber Co.* v. *McLeod,* 96 Ark. 405, 131 S.W. 878. Of course, it follows that evidence without probative value cannot be considered in determining legal sufficiency of the evidence. See *Fleming* v. *Twiggs,* 244 N.C. 666, 94 S.E. 2d 821 (1956). I submit that there was no substantial evidence of appellant's negligence and that a verdict for appellant should have been directed.

Perhaps such a consideration is extraneous, but I shudder to think of the impact this decision will have on the cost of the minimum insurance required by the motor-vehicle safety responsibility act. Ark. Stat. Ann. § 75-1401, et. seq. (Repl. 1957). When liability for a recovery of

amounts in excess of these limits may be imposed by a jury passing in judgment upon a difference of opinion as to the probable outcome and award in an automobile collision case, and the perfect vision of hindsight can be utilized, the minimum policy limits may well come to have little meaning in any case in which a claim could have been settled for less before trial, but was not. It also gives me pause when I consider the potential increase in the number of uninsured motorists likely to be driving on our highways because of the cost of protection within the minimum limits. Of course, this would mean that uninsured motorist coverage premiums would inevitably increase. Reverting to the opinion in *American Casualty Co. v. Howard,* supra, I find this further language of the Fourth Circuit Court of Appeals appropriate, viz:

> We have adverted at some length to the duty of the insurer under the policy here to safeguard the interests of the insured. It should be remembered, though, that the premium on such policies varies with the insurer's maximum limit of liability under the policy. Accordingly, when the insurer fully lives up to its duty, there is no right in the insured to compel the insurer to offer the amount of its maximum limit in order to effect the amicable settlement of a claim against the insured and to protect the insured against a possible judgment in excess of the policy limit. Insured can readily secure all needed protection by purchasing, and paying for, a policy with a high limit of liability on the insurer.

I would reverse the judgment and dismiss the case.

I am authorized to state that Mr. Justice Brown joins in this dissent.

CONLEY BYRD, Justice, dissenting in part. I dissent to that portion of the majority opinion disallowing the accumulated interest on the Frisby judgment against Blissett.

Article 2 § 13 of the Arkansas Constitution, provides that, "Every person is entitled to a certain remedy in the

laws for all injuries or wrongs he may receive in his person, property or character, . . ."

Arkansas Statutes § 29-124 (Repl. 1962), provides:

"Creditors shall be allowed to receive interest at the rate of six (6) per cent per annum on any judgment before any court or magistrate authorized to enter up the same from the day of signing judgment until the effects are sold or satisfaction be made;. . ."

Arkansas Statutes § 68-606 (Repl. 1957), requires that upon receipt of partial payment on any judgment the amount thereof shall first be credited to payment of interest and the balance if any to principal.

In speaking of the damages suffered by the insured when the insurer negligently fails to settle within the policy limits and an excess verdict is entered, the annotator in 40 A.L.R. 2d at page 190 (§ 7 Damages) states:

"The great majority of the cases involving a charge that a liability insurer has wrongfully rejected an offer by the injured party to compromise a claim against the insured have involved the situation where, following a refusal by the insured to contribute a figure within the policy limits toward a compromise offer, the action against the insured results in an adverse judgment in excess of the insurance coverage. There appears to be no doubt that in such a situation an insurer whose bad faith or negligence (as required in the particular jurisdiction) is established, may be held liable to the insured for the amount which the latter was required to pay in satisfaction of the judgment, in so far as that amount exceeds any contribution which the insured would have had to make if the settlement offer had been accepted."

From the foregoing, I conclude that the injury suffered because of the insurer's conduct is that amount of the judgment entered in excess of the policy limits. This amount, however by virtue of Ark. Stat. Ann. § 29-124 (Repl. 1962), and Ark. Stat. Ann. § 68-606, *supra,* in-

cludes the interest accumulating thereon at the rate of six percent per annum. If then, in an action by the insured against the insurer for negligent failure to settle, the damage or injury is the excess judgment, where have we provided a remedy pursuant to Art. 2 § 13 of the Constitution for the injury the insured received if we hold that he is not entitled to the accumulated interest on the judgment against him?

If appellant had performed its duty and settled within the policy limits there would be no excess judgment on which interest could accumulate. Thus, I take it as being logically established that the accumulating interest on the judgment against Blissett is the direct and proximate cause of the insurer's wrongful conduct. In other words the accumulating interest is nothing more nor less than an injury that is permanent and continuing in character. In 22 Am. Jur 2d Damages § 19, it is pointed out that such damages may be recovered to the date of trial ". . . if they are the natural and necessary result of the injury complained of and do not themselves constitute a new cause of action—or in other words, if no other action can be maintained for them."

The illogic of the majority view can be shown by assuming that the insurer in its private correspondence conceded its liability for the excess judgment of some $11,-000 but through dilatory tactics and a crowded trial court docket found that it could delay a trial on the issue for two years. In that situation the insurer could deposit the $11,000 in a savings account and draw an income of $1,-320 at 6% interest while the judgment against Blissett is increasing to ($11,000 plus $1,320) to $12,320. I cannot think of anything more disgusting than a law that makes it profitable for one to delay the payment of his just obligations. In condemning a similar delay in *Consolo* v. *Federal Maritime Comm'n*, 383 U.S. 607 (1966), Mr. Justice White stated:

". . . Further, although Flota's suit was pending for about two years, the record indicates that much of the delay involved in this case was at the request or approval of Flota. At any rate, it has never been

the law that a litigant is absolved from liability for that time during which his litigation is pending. . . . During this time Flota was able to postpone the predictable demise of its discriminatory contract and Consolo continued to suffer injury."

The interest issue has been discussed in two cases before this court, *Southern Farm Bureau Casualty Insurance Co. v. Hardin*, 233 Ark. 1011, 351 S.W. 2d 153 (1961), and *Tri State Insurance Company v. Busby*, 251 Ark. 568, 473 S.W. 2d 893 (1971). If they are authority for the proposition now before the court, they should be overruled as a denial of a remedy for a wrong under Art. 2 § 13, *supra*.

Actually the matter of the recovery of interest has generally had a rather summary (and sometimes inconsistent) treatment in our many decisions. See for instance, *Kelly v. Altemus*, 34 Ark. 184 (1879), where the court said:

"The ordinary measure of damages for the plaintiff in replevin, in the absence of proof of special damage, is legal interest on the value of the property, in addition to the property itself or its value. . . . This with regard to property which has no useable value, except for consumption. With regard to property having a useable value by way of bailment for hire, like horses or tools, the true measure is the value of the use during the detention. . . ."

In *Bradley Lumber Co. v. Hamilton*, 117 Ark. 127, 173 S.W. 848 (1915), there was a claim for conversion of timber. In holding that the claimant was entitled to interest on the value it was said:

"In *Nunn v. Lynch*, *supra*, the court cited with approval the discussion in the case of *Laycock v. Parker*, 103 Wis. 161. In that case the court held that where damages were capable of ascertainment by reference to reasonably certain market values and the various items of damage have been duly and adequately presented, and its payment demanded before suit

is commenced, the claimant is entitled to interest from the time of such demand.

"The claim of the plaintiff in this case was capable of ascertainment by the defendant after its presentation by reference to the reasonably certain market value of timber cut and removed by the defendant. Therefore, the plaintiff was entitled to interest, and no error prejudicial to the defendant was committed in the allowance made by the court."

However, in *Kansas City Fibre Box Co.* v. *F. Burkhart Mfg. Co.,* 184 Ark. 704 (1931), appellant had sold the timber it had cut and removed from appellee's land by filing a cross bond in a replevin action. This court, after upholding a rather generous market value finding without a deduction for the cost of hauling to the rail siding, rather summarily denied a cross appeal for interest on the basis that no demand had been made prior to trial.

In a number of tort cases interest has been allowed either by the court or the jury. In *Nunn* v. *Lynch,* 89 Ark. 41, 115 S.W. 926 (1908), interest was allowed in an ejectment action. In *Railway Co.* v. *Yarbrough,* 56 Ark. 612 (1892), the allowance upon the value of crops destroyed by flood water was approved. In *Ryburn* v. *Pryor,* 14 Ark. 505 (1854); *Hooten* v. *State, Use of Cross County,* 119 Ark. 334, 178 S.W. 310 (1915); *Meyers* v. *Meyers,* 210 Ark. 714, 197 S.W. 2d 477 (1946), and *Humphreys* v. *Butler,* 51 Ark. 351 (1888), interest was allowed for conversion.

The allowance of interest by the jury in personal injury actions has been approved in *The Railway Ice Company* v. *Howell,* 117 Ark. 198, 174 S.W. 241 (1915), and in *St. Louis I.M. & Ry Co.* v. *Cleere,* 76 Ark. 377, 88 S.W. 995 (1905)[1]. In the last mentioned case the issue was the sufficiency of the evidence to sustain a $20,000 verdict. In so doing this court stated:

---

[1] A.M.I. § 2219, the present value instruction requires the jury to consider interest with respect to future damages.

"The plaintiff was entitled to interest at the rate of 6 per cent per annum on the amount of the damages from the date of Tomlinson's death, when the cause of action arose, to date of recovery. Computing interest at that rate on an estimate of damages at $13,190 from July 8, 1894, the date of Tomlinson's death, up to February 14, 1903, the date of judgment, would make a total of $20,000 principal and interest."

In summation, I submit that the tort theory used in *Tri State Ins. Co.* v. *Busby, supra,* does not stand the test of our prior decisions. The *Busby* case also fails to recognize that the matter in issue is a liquidation claim that constitutes a continuing injury to the aggrieved insured. Since I can think of no way in which the accumulating interest on the excess judgment against Blissett can be considered in any way other than an injury directly and proximately caused by Members Mutual Insurance Company, it appears to me that we are violating Art. 2 § 13 of the Constitution, *supra,* when we deny to Blissett a remedy for the wrong he has received.

Other jurisdictions ordinarily allow the recovery of interest. See *Southern Farm Bureau Casualty Insurance Co.* v. *Mitchell,* 312 F. 2d 485 (1963 C.A.A. 8); *Augustin* v. *General Accident Fire and Life Assurance Corp.,* 283 F. 2d 82 (7th C.A.A. 1960); and *Lee* v. *Nationwide Mutual Insurance Company,* 286 F. 2d 295 (4th C.A.A. 1961).

For the reasons stated, I respectfully dissent to the disallowance of the accumulated interest.